[Crim. No. 10922.    Second Dist., Div. Two.    June 23, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. DAVID ELIAS KADISON et al., Defendants and Appellants.

Brydolf, Gray, Whyte & Harrison, John H. Whyte and Charles A. Harrison for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendants appeal from the judgments convicting them of possessing marijuana in violation of section 11530 of the Health and Safety Code. By way of assignment of error, each appellant contends (1) that the jury's verdict was "contrary to the law or evidence;" (2) that the trial court erred in striking appellant Kadison's testimony when he refused to answer a certain question during cross-examination; and (3) that the prosecuting attorney was guilty of prejudicial misconduct in commenting on testimony of Kadison which had been stricken from the record.

The evidence in support of the verdict is exceptionally strong. Mrs. Janet Schouten, age 19, testified that she and her husband lived in a house with upper and lower apartments. Kadison lived in the upper "attic apartment." Some time prior to May 29, 1964, Janet had a conversation with Kadison during which he brought up the subject of marijuana and its effects. He told her that "you feel high." Thereafter, on May 29, 1964, Janet had a conversation with Officer Carnighan of

the Sierra Madre Police Department in her apartment. Later that night, during the early morning hours of May 30, 1964, Janet went upstairs where 25 or 30 people were gathered.

Appellants David Kadison and Lawrence Dorothy were then in the upstairs apartment. The latter asked Janet and Cathie Johnson, age 20, whether they would like to go downstairs with him and Kadison and smoke marijuana. Thereupon the four of them went downstairs. Kadison stated that he thought they should go further away so that no one would see them.

As they went around the building, appellant Dorothy took a cigarette out of his pocket, lit it, and took one "drag." He inhaled it and held it a long time before exhaling. He then handed the cigarette to Kadison. Kadison inhaled, held the smoke in before exhaling in the same fashion Dorothy had done. He then handed the cigarette to Cathie. She asked appellants how to smoke it, i.e., "What do I do? Do I inhale? How long do I hold it? Why do I hold it in?" Both appellants responded by telling her to suck a lot of air in with it and to hold it down as long as she could.

At this point Janet coughed which was a prearranged signal to Officer Carnighan who had been observing the parties from Janet's downstairs apartment. Officer Carnighan testified that he had observed the lighting of the cigarette, the manner of its smoking, and its transfers among the parties as reported by the girls. When Officer Carnighan came out of the house, Cathie dropped the cigarette and both girls ran. Officer Carnighan observed where the cigarette had fallen. He saw it on the ground just about where Cathie had been standing.

Officer Carnighan indicated the cigarette to Sergeant Heasley, who had been called to the scene. Sergeant Heasley picked the cigarette up noting that it was still warm. A search of the area disclosed no other cigarettes. The material contained in the cigarette was marijuana. An expert witness testified that when a suspected person is seen to inhale, take in more air and hold it while smoking, there is good reason to believe that he is smoking marijuana. "The purpose of inhaling the air is to expand the lungs to allow the dissemination of the narcotic within the lungs to reach the many blood streams, gets into the blood stream and to the nervous system."

Both appellants testified in their own behalf and described the occurrences at the scene much in the same manner as had the witnesses for the prosecution. However, each denied any discussion of marijuana with the girls and denied inviting them outside to smoke marijuana. Appellants testified that

they went outside the building to get some air and that the girls followed them. Each appellant also testified that Dorothy had taken a cigarette from his pocket, lit it and took "a drag" thereon before giving it to Kadison. However, they testified that Kadison had simply asked Dorothy for a cigarette. Dorothy testified that he had given Kadison a Lucky Strike. They further testified that Cathie had asked them for a light and that Kadison had handed her the cigarette he was smoking so that she might light her own therefrom.

Prior to his taking the stand, Kadison's counsel had advised the court that Kadison would testify that he had knowledge concerning marijuana because he had studied it in a biology class in college. During his direct examination, Kadison had testified that he had been employed as a saxophone player in a band on the date in question and had just returned to his apartment shortly before the occurrence that led to his arrest. He testified that the reason he left the apartment was his anger over finding a party going on therein when he was tired. He described the area where the incident involved occurred as "pitch black." He testified further on direct examination as follows:

"Q. Now, what was your state of mind as you took this cigarette at that location when you went down and located with the four of them? A. It was clear. Q. I know it was clear, but did you still have any thoughts about what had gone on upstairs? A. Oh, yes. *I was very disturbed.* Q. I see. Was there anything unusual as you think back now of this cigarette that Larry Dorothy gave you? A. No, not at all. Q. *While I am on that question,* Mr. Kadison, do you know anything about marijuana? A. Yes, I do. Q. Where did you learn about marijuana? A. While I was attending Pasadena City College. I took a health-education course for a semester and I wrote sort of a term paper on marijuana. Q. I see. Now, what, if anything, did you do with the cigarette after you took a drag? A. As I recall, Cathie Johnson asked me for a light. So, I handed her my cigarette." (Italics added.)

From the adroit manner in which appellant Kadison's testimony concerning his academic knowledge of marijuana was combined with his testimony concerning his disturbed state of mind and his actions on the night in question, it was very apparent that he was seeking to establish in the minds of the jurors the basis for two favorable inferences. First, he was attempting to picture himself as a young college man who had studied the subject and therefore, being fully aware of its

dangerous and deleterious qualities, he would be most unlikely knowingly to use the contraband. Second, he was laying the foundation for his argument that if the cigarette which his codefendant gave him did contain marijuana, it was understandable that in view of his "disturbed" state of mind and the attendant circumstances, he was wholly unaware of its true nature, and therefore lacked the necessary knowledge and intent required to constitute his possession of the cigarette a crime. In arguing the propriety of inquiring into his state of mind, his counsel had stated to the court:

"The show of proof for the purpose of proving the materiality of it will be as follows: That this witness will testify that when he found this condition [the party in his apartment], he was surprised, became indignant, didn't know the people. It was his apartment. Because of the physical layout of the apartment, his personal effects were being completely pressed, stood on, everything else. As a result, he couldn't do anything. In about 30 or 40 minutes later, he walked out and left and went downstairs and this was the state of mind he was in when these two girls followed down behind them and the cigarette incident which the testimony is about. . . . It will show his state of mind as to what he will claim. It is his testimony that the cigarette was given to him, took a drag of it, is not quite clear what happened after that, the noise and commotion. He was new in the neighborhood, didn't want to get the credit for this kind of thing, and the state of mind colored it all the way through as to *whether he ever had the intent or knew what was going on as to the crime that was committed*. . . . I want the jury to determine whether or not he was—they think he was reasonably insane, though. The facts as they go in up to now, your Honor, certainly establish that he was enraged and had reason. Wouldn't it have a basic bearing on when he left and the conditions under which he left and *how he was exposed to what appears to be a narcotic cigarette?*" (Italics added.)

■ We regard it as beyond serious question that the prosecution was entitled to attack both of appellant Kadison's defensive postures. Since he sought to portray himself as one whose knowledge of the dangerous qualities of marijuana had been acquired in the course of his college studies, it was entirely proper for the prosecution to prove that in truth his knowledge was derived from his own prior illegal use of the contraband. The knowledge that might be acquired in reading treatises or hearing lectures quite obviously would not provide

the knowledge of taste, smell or sensation which would be gained only by actual use.

Secondly, it was entirely proper for the prosecution to attack Kadison's testimony that despite his general knowledge of marijuana acquired through his academic studies, he had failed to recognize that the cigarette which he had accepted from his codefendant was one containing marijuana, and this because of the "pitch black" conditions outside the house and his own "disturbed" mental condition.

Therefore, on cross-examination, appellant was asked the following question: "And you say that you know about marijuana? You know about marijuana because you have smoked marijuana; isn't that true?" Objection was made to this question on the ground of immateriality. The objection was properly overruled and Kadison was directed to answer the question. He then stated: "I stand on the Fifth Amendment." The prosecution then moved to strike the entirety of his testimony and the motion was granted.

Appellants have not contended either in the court below or on this appeal that this action was improper if, in fact, appellant Kadison had no right to assert his privilege against self-incrimination.[1] They further concede that he would have no right to assert his privilege if the question which he declined to answer was relevant and proper cross-examination. Such concessions are proper. As expressed in *Brown* v. *United States*, 356 U.S. 148, 154-156 [78 S.Ct. 622, 2 L.Ed.2d 589, 72 A.L.R.2d 818]:

"Our problem is illumined by the situation of a defendant in a criminal case. If he takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. '[H]e has no right to set forth to the jury

[1] In point of fact, from the record before us it appears that appellant Kadison's counsel was well content with the ruling of the trial court. He sought a mistrial by reason of the question asked by the deputy district attorney upon the theory that it was improper, thereby requiring him to assert his Fifth Amendment privilege. However, he declined the court's repeated offer to withdraw its ruling or to permit him to return to the stand for further direct examination. Apparently satisfied by the fact that the jury actually had heard his testimony, although it was subsequently stricken, and by the fact that by the court's ruling he was enabled to escape further cross-examination, appellant declined all offers of the court to modify the situation, contending that the damage done by the question, his forced refusal to answer, and the subsequent ruling of the court, had irreparably prejudiced his case.

all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.' [Citations.]
. . .

". . . . . . . . . . . . .

"[W]hen a witness voluntarily testifies, the privilege against self-incrimination is amply respected without need of accepting testimony freed from the antiseptic test of the adversary process. The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry. Such a witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all. He cannot reasonably claim that the Fifth Amendment gives him not only this choice, but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell. '[T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.' [Citation.] The interest of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination. Petitioner, as a party to the suit, was a voluntary witness. She could not take the stand to testify in her own behalf and also claim the right to be free from cross-examination on matters raised by her own testimony on direct examination." (Cf. also, *People* v. *Withers*, 73 Cal.App.2d 58, 60-61 [165 P.2d 945].)

As heretofore indicated, we have concluded that the question asked appellant was entirely proper. "The test for admissibility is: 'does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' [Citations.]

". . . . . . . . . . . . .

". . . Upon cross-examination of Sykes it was proper to ask if he had ever had narcotics in his possession. Sykes was

charged with giving narcotics to Beverly. Previously Sykes had repeatedly denied in broad terms the commission of the crime. *In such circumstances, the permissible scope of cross-examination is very wide.* [Citation.] The evidence that at prior times he had narcotics in his possession was admissible to show familiarity with them.'' (Italics added.) (*People* v. *Sykes*, 44 Cal.2d 166, 170-171 [280 P.2d 769].)

■ It is true, of course, that where lack of knowledge of the narcotic character of the substance in issue clearly is not the defense being advanced, evidence of prior convictions may constitute error. (Cf. *People* v. *Spencer*, 140 Cal.App.2d 97, 103-105 [294 P.2d 997] ; *People* v. *Lapin*, 138 Cal.App.2d 251, 262 [291 P.2d 575].) ■ However, where, as here, the extent of a defendant's familiarity with narcotics is a vital issue to be determined, inquiry on the subject may not be foreclosed by testimony that he had gained some undefined knowledge thereof as the result of his commendable academic pursuits.

Both appellants argue that the district attorney committed prejudicial error in commenting upon the testimony of Kadison that had been stricken. We have carefully examined the arguments of the deputy district attorney and find no instance in which he referred to the testimony which had been stricken nor to the effect of such ruling. We, therefore, do not reach the question of what comment, if any, the prosecution might make under such circumstances as here presented.

Appellants' final contention is that the jury's verdict is ''contrary to the law or evidence'' because the jury found them not guilty on the first count of the information charging them with furnishing marijuana to a minor and such determination is inconsistent with their verdict on the second count charging them with possession of marijuana. Since the 1927 amendment to section 954 of the Penal Code, it has been held that inconsistency in the factual or legal sense here argued does not impair the validity of a verdict. (Witkin, Cal. Criminal Procedure (1963) § 549, pp. 559-560, and cases cited therein.)

The judgments are affirmed.

Roth, P. J., and Fleming, J., concurred.