[No. A089753. First Dist., Div. Two. May 8, 2000.]

DAN FOST, Petitioner, v.
THE SUPERIOR COURT OF MARIN COUNTY, Respondent;
DARRELL HUNTER et al., Real Parties in Interest.

**COUNSEL**

Perkins Coie; James F. Brelsford; Rachel A. Silvers; Chun T. Wright; and Susan M. Infantino for Petitioner.

Crosby, Heafey, Roach & May, John E. Carne, Kathy M. Banke, Helen P. Thorndal and Tait Graves for the Los Angeles Times, published by the Times Mirror Company, The San Diego Union-Tribune and the Daily Breeze of Torrance, published by The Copley Press, Inc., McClatchy Newspapers, Inc., publisher of The Sacramento Bee, The Fresno Bee and The Modesto Bee, Knight Ridder, Inc., publisher of the San Jose Mercury News, the Contra Costa Times, the Valley Times, the West County Times, The Monterey County Herald and the San Luis Obispo County Tribune, and the California Newspaper Publishers Association as Amici Curiae on behalf of Petitioner.

Paula Freschi Kamena, District Attorney, and Kevin Jones, Deputy District Attorney, for Respondent.

Arthur K. Wachtel and John T. Philipsborn for Real Party in Interest Darrell Hunter.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Michael E. Banister and Christina V. Kuo, Deputy Attorneys General, for Real Party in Interest People of the State of California.

## OPINION

**KLINE, P. J.**—This writ proceeding presents a question of first impression relating to the newspersons' shield law. (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070.)

Petitioner Dan Fost, a journalist, asks us to vacate an order of respondent superior court holding him in contempt for refusing to disclose "unpublished information," claiming that the contempt order is prohibited by the shield law. We conclude that the contempt order must be set aside, although on grounds other than those asserted by petitioner.

### I. FACTS AND PROCEDURAL HISTORY

Petitioner was subpoenaed by real party in interest Darrell Hunter (defendant), to testify for the defense at a criminal trial at which Hunter was charged with, among other things, murder with special circumstances. Petitioner wrote news articles published in the Marin Independent Journal quoting Shayla Davis, considered by defense counsel "the principal eyewitness in the case." Statements petitioner attributed to Davis describing the homicide were inconsistent with those she made at trial as a witness for the prosecution. For example, petitioner reported that Davis told him she saw three or four men break into the apartment in which the homicide took place and that she then saw the victim "reaching for a gun." At trial, she testified that she saw only one man break in and never saw the victim reach for a gun. Confronted with these discrepancies, Davis denied making the statements attributed to her by petitioner.[1]

Petitioner agreed to defendant's request that he testify, on the condition his testimony would be limited to authentication of the news articles in question and his general journalistic practices; he was unwilling to provide

---

[1] We take judicial notice of the briefs and record before this court in *Hunter v. Superior Court* (Jan. 12, 2000, A089527) (nonpub. opn.). (Evid. Code, § 452, subd. (d).)

any testimony pertaining to unpublished information protected under the shield law. Defendant agreed to this condition;[2] the People, however, did not.

The district attorney moved to quash defendant's subpoena of petitioner, arguing that if petitioner's testimony was limited to authentication of the articles and his general journalistic practices, the People would be prevented from exploring circumstances of the interview or interviews petitioner conducted with Davis that may have led to inaccuracies in his account of what she said to him. Defense counsel disagreed. Insisting that "cross-examination is not the issue because clearly there can be cross-examination within the permissible bounds of the law," he argued that the shield law simply meant "that neither party can get into unpublished information," implying the People were therefore not prejudiced.

After a hearing out of the presence of the jury, at which petitioner was subjected to direct and cross-examination, the trial court concluded that the shield law deprived the People of the ability to conduct proper cross-examination. Concluding that petitioner's testimony would not materially assist the defense, and that defendant's federal constitutional right to a fair trial was therefore not strong enough to overcome the shield law (a determination purportedly made pursuant to *Delaney v. Superior Court* (1990) 50 Cal.3d 785 [268 Cal.Rptr. 753, 789 P.2d 934], which we discuss presently), the court granted the People's motion to quash defendant's subpoena.

On January 4, 2000, defendant Hunter filed a petition for writ of mandate with this court (*Hunter v. Superior Court, supra,* A089527), contending that reporter Fost's testimony was critical to a full and fair determination of the case and that the trial court erred in quashing the subpoena. On January 12, 2000, we issued a peremptory writ in the first instance, and vacated the trial court's order quashing the subpoena.

On January 18, 2000, petitioner testified about published information and general journalistic practices. His testimony on direct was simply to the effect that he wrote a newspaper article published in the Marin Independent Journal containing statements made to him by Shayla Davis and others, several of which statements he placed in quotation marks. He also testified that the statements in quotation marks reflected the substance of the statements made to him by Shayla Davis; "[t]hey're words that Shayla Davis said

---

[2]As stated by defense counsel at trial: "we are . . . seeking to have Mr. Fost present brief testimony about an article that he wrote[,] authenticating the article, describing his general practices, his general journalistic practices in writing an article, in quoting persons, and in reporting statements of persons. And we feel, based on our understanding of the case law, that we can do that without offending the shield law, without getting into problems of who else he talked to, what else he was talking to people about."

to me." Petitioner interposed no shield law objection to any question put to him by defense counsel.

On cross-examination, the district attorney sought to elicit from petitioner the circumstances of his interview or interviews with Davis, endeavoring to cast doubt on the accuracy of the statements attributed to her. Petitioner declined to answer 13 questions pursuant to the shield law. For example, he was asked where Shayla Davis was when he interviewed her, whether others were present during the interview, whether he told Davis that what he wanted to hear from her was just what she personally saw or heard, and whether Davis told him that she saw three or four people enter the apartment. Despite orders by the court to answer these questions, petitioner refused to do so, asserting that the questions related to unpublished information protected under the shield law. The trial court thereupon found petitioner in contempt and imposed a fine of $1,000 per day for each day he refused to answer. Respondent court stayed the order of contempt and payment of fine until January 24, 2000.

On January 20, 2000, petitioner commenced the instant proceeding in our court, seeking a peremptory writ commanding respondent court to vacate its order holding him in contempt and imposing a fine. We stayed enforcement of the contempt order, issued an order to show cause, requested further briefing, and heard oral argument.[3] Subsequently, the jury returned several guilty verdicts against defendant.

## II. Discussion

■ The shield law, set forth not just in the Evidence Code (§ 1070) but in our Constitution (art. I, § 2, subd. (b)), provides that "[a] . . . reporter . . . shall not be adjudged in contempt . . . for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public." " 'Stated more simply, article I, section 2(b) protects a newsperson from being adjudged in contempt for refusing to disclose either: (1) unpublished information, or (2) the source of information, whether published or unpublished.' " (*Miller v. Superior Court* (1999) 21 Cal.4th 883, 890 [89 Cal.Rptr.2d 834, 986 P.2d 170], quoting *Delaney v. Superior Court, supra,* 50 Cal.3d at pp. 796-797, fn. omitted.) As our Supreme Court emphasized in *Miller,* "[t]he shield law is, by its own terms, *absolute* rather than qualified in immunizing a newsperson from contempt for revealing unpublished information obtained in the newsgathering process. As we have explained: ' "Since contempt is generally the

---

[3]We also received a brief and a supplemental brief of amici curiae in support of petitioner from various newspapers and the California Newspaper Publishers Association.

only effective remedy against a nonparty witness, the California enactments [article I, section 2, subdivision (b) and Evidence Code section 1070] grant such witnesses *virtually absolute protection* against compelled disclosure." [Citation.]' " (*Miller v. Superior Court, supra,* 21 Cal.4th at pp. 890-891, original italics.)

*Miller* emphasizes that though in a criminal case the People have the right to due process of law under article I, section 29 of the California Constitution, this right "specifically does not mean a right of access to evidence in contravention of previously existing evidentiary privileges and immunities, which include those given to the press. Therefore, there is no conflict between the shield law and the subsequently enacted people's right to due process of law . . . ." (*Miller v. Superior Court, supra,* 21 Cal.4th at p. 895.) The court explained that "there is nothing illogical in interpreting 'the people['s] . . . right to due process' *not* to include the right to compel the press through the sanctions of contempt—incarceration and substantial fines—to supply unpublished information obtained in the newsgathering process. The fact that the assertion of this immunity might lead to the inability of the prosecution to gain access to all the evidence it desires does not mean that a prosecutor's right to due process is violated, any more than the assertion of established evidentiary privileges against the prosecution would be a violation. [Citations.]" (*Id.* at p. 898, original italics.)

However, while the "virtually absolute protection" provided under the shield law need never yield to any superior constitutional right of the People, "the protection of the shield law must give way to a conflicting federal constitutional right *of a criminal defendant.*" (*Miller v. Superior Court, supra,* 21 Cal.4th at p. 891, italics added.) As stated in *Delaney v. Superior Court, supra,* 50 Cal.3d 785, which was reaffirmed in *Miller,* "[T]he shield law's protection is overcome in a criminal proceeding on a showing that nondisclosure would deprive the defendant of his federal constitutional right to a fair trial. . . . The incorporation of the shield law into the California Constitution cannot restrict a criminal defendant's *federal* constitutional right to a fair trial. [Citations.] Such result would violate the supremacy clauses of the federal and state Constitutions." (*Delaney, supra,* 50 Cal.3d at pp. 805-806, fns. omitted, original italics.)

"In *Delaney,* the court formulated a two-stage inquiry to determine whether a court's contempt power could be invoked to enforce a criminal defendant's subpoena against a newsperson, the shield law notwithstanding. At the threshold, the defendant must show 'a reasonable possibility [that] the information will materially *assist his defense.*' [Citation.] If he makes this showing, then the court is to proceed to the second stage of the inquiry and

balance the criminal defendant's and the newsperson's rights, considering whether the unpublished information in question is confidential or sensitive, the degree to which the information is important to the criminal defendant, whether there is an alternative source of unpublished information, and whether there are other circumstances which may render moot the need to avoid disclosure. [Citation.]" (*Miller v. Superior Court, supra*, 21 Cal.4th at pp. 891-892, original italics.)

While *Miller* and *Delaney* are certainly relevant to our analysis, each is significantly different from this case in an important factual particular. Unlike *Miller*, the person from whom unpublished information is sought in this case was subpoenaed by the defense, not by the People, and the People sought disclosure in the course of cross-examination designed to test the credibility of the witness's testimony in favor of the defendant. *Delaney* is also factually distinguishable because in that case the unpublished information was sought by the defendant; here the defendant never sought such information and the witness disclosed all the information he did seek. The situation presented in this case was therefore not contemplated by *Miller*, *Delaney* or, indeed, by any other shield law case of which we are aware.

The district attorney, apparently alert to the prosecutorial disability imposed by *Miller*, never asserted that petitioner's responses to his questions were compelled by any constitutional right of the People; his very different contention was that petitioner's use of the shield law to resist meaningful cross-examination denied "*defendant*'s Sixth Amendment rights of confrontation . . . ." (Italics added.) In effect, the district attorney maintained that the People's right to conduct meaningful cross-examination derived from the defendant's Sixth Amendment right to call witnesses in his favor. Implicit in this argument is the assumption that a criminal defendant's Sixth Amendment right to call favorable witnesses applies only to witnesses willing to submit to proper cross-examination, and that a witness cannot refuse to submit to such examination on the basis of a privilege without showing that his right not to disclose transcends the right of the defendant to a fair trial. However, a defense witness who resists cross-examination on the basis of a privilege cannot be required to show that his right transcends the constitutional right of the defendant where the defendant is not asserting any such right. The question then is whether the People can compel the defendant either to assert the right and show that it transcends that of the witness under the shield law or to forgo the benefit of the witness's testimony in his favor. Our answer is in the affirmative.

We hold that where, in a criminal trial, a defense witness protected under the shield law resists proper cross-examination on the basis of that law, the

testimony of that witness on direct examination, though it did not consist of unpublished information protected by the shield law, may on an appropriate motion by the People be barred or stricken unless the defendant can show that the refusal of the court to receive such evidence would deprive him of a federal constitutional right to a fair trial and that, in the circumstances, his right transcends that of the witness under the shield law. If the defendant makes such showings, the testimony of the witness on direct may be received by the trier of fact and the newsperson may be held in contempt of court for refusing to respond to proper cross-examination seeking information that would otherwise be protected under the shield law.

Our holding rests on the centrality of cross-examination to our justice system. Though the right to cross-examine adverse witnesses has been mandated by the Legislature,[4] it is not merely a statutory right.

■ Cross-examination—described by Wigmore as " 'the greatest legal engine ever invented for the discovery of truth' " (*People v. Reynolds* (1984) 152 Cal.App.3d 42, 46 [199 Cal.Rptr. 379], quoting 5 Wigmore, Evidence (3d ed. 1940) § 1367, p. 29; see also *Dutton v. Evans* (1970) 400 U.S. 74, 89 [91 S.Ct. 210, 219-220, 27 L.Ed.2d 213]; *Bruton v. United States* (1968) 391 U.S. 123, 135-137 [88 S.Ct. 1620, 1627-1629, 20 L.Ed.2d 476])—has two purposes. Its chief purpose is "to test the credibility, knowledge and recollection of the witness. (*Sharp v. Hoffman* (1889) 79 C[al]. 404, 408, 21 P. 846; *Razzo v. Varni* (1889) 81 C[al]. 289, 292, 22 P. 848 ['to sift, explain, or modify what has been said on the examination in chief, and to discredit the witness']; *Neal v. Neal* (1881) 58 C[al]. 287, 288 . . .) [¶] The other purpose is to elicit additional evidence." (3 Witkin, Cal. Evidence (3d ed. 1986) § 1873, p. 1827; see also *Priestly v. Superior Court* (1958) 50 Cal.2d 812, 822 [330 P.2d 39] (conc. opn. of Carter, J.).) Because it relates to the fundamental fairness of the proceedings, cross-examination is said to represent an "absolute right," not merely a privilege (*People v. Abner* (1962) 209 Cal.App.2d 484, 489 [25 Cal.Rptr. 882]; *People v. Flores* (1936) 15 Cal.App.2d 385, 401 [59 P.2d 517]), and denial or undue restriction thereof may be reversible error. (*People v. Redwine* (1958) 166 Cal.App.2d 371 [333 P.2d 188].)

This is the view not just of California courts but of the highest court of our land, which has declared: "Cross-examination of a witness is a matter of

---

[4]Cross-examination—defined as "the examination of a witness by a party other than the direct examiner upon a matter that is within the scope of the direct examination of the witness" (Evid. Code, § 761)—is required under Evidence Code section 711, which provides that "[a]t the trial of an action, a witness can be heard only in the presence and subject to the examination of all the parties to the action, if they choose to attend and examine." (Evid. Code, § 711.) "A witness examined by one party may be cross-examined upon any matter within the scope of the direct examination by each other party to the action in such order as the court directs." (Evid. Code, § 773.)

right. [Citation.] Its permissible purposes, among others, are . . . that facts may be brought out tending to discredit the witness by showing that his testimony in chief was untrue or biased. [Citations.] [¶] Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. [Citations.] It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. [Citations.] To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial. [Citations.]" (*Alford v. United States* (1930) 282 U.S. 687, 691-692 [51 S.Ct. 218, 219, 75 L.Ed. 624]; accord, *Chambers v. Mississippi* (1973) 410 U.S. 284, 295 [93 S.Ct. 1038, 1045-1046, 35 L.Ed.2d 297]; *Smith v. Illinois* (1968) 390 U.S. 129, 131 [88 S.Ct. 748, 749, 19 L.Ed.2d 956]; *Douglas v. Alabama* (1965) 380 U.S. 415, 419-420 [85 S.Ct. 1074, 1077-1078, 13 L.Ed.2d 934].) In short, cross-examination is "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." (*Pointer v. Texas* (1965) 380 U.S. 400, 405 [85 S.Ct. 1065, 1068, 13 L.Ed.2d 923].)

This case is in certain respects similar to those in which the defendants took the stand and testified in their own behalf but refused to respond to proper cross-examination on the basis of the Fifth Amendment. *Brown v. United States* (1958) 356 U.S. 148 [78 S.Ct. 622, 2 L.Ed.2d 589, 72 A.L.R.2d 818] was a civil action commenced by the government for the petitioner's denaturalization on the ground that she had fraudulently procured citizenship. The petitioner testified at length in her own defense but refused, on grounds of self-incrimination, to answer questions put to her on cross-examination that were relevant to her testimony on direct examination. The trial court ruled she had waived her privilege by testifying in her own defense and ordered her to answer. She refused to do so and was summarily adjudged guilty of criminal contempt and sentenced to imprisonment. The Supreme Court sustained the conviction. Speaking for the majority, Justice Frankfurter drew an analogy to the situation of a defendant in a criminal case. "If he takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. '[H]e has no right to set forth to the jury all the facts

which tend in his favor without laying himself open to a cross-examination upon those facts.' *Fitzpatrick* v. *United States* [(1900)] 178 U.S. 304, 315 [20 S.Ct. 944, 949, 44 L.Ed. 1078]; and see *Reagan* v. *United States* [(1895)] 157 U.S. 301, 304-305 [15 S.Ct. 610-611, 39 L.Ed. 709]. The reasoning of these cases applies to a witness in any proceeding who voluntarily takes the stand and offers testimony in his own behalf. It is reasoning that controls the result in the case before us." (*Brown v. United States, supra,* at pp. 154-155 [78 S.Ct. at pp. 626-627].) Our own Supreme Court reached the same result in *People v. Cooper* (1991) 53 Cal.3d 771, 822 [281 Cal.Rptr. 90, 809 P.2d 865], where it declared that "[a] defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies." (*Id.* at p. 822; see also *People v. Kadison* (1966) 243 Cal.App.2d 162 [52 Cal.Rptr. 114]; *People v. Reynolds, supra,* 152 Cal.App.3d 42; *People v. McGowan* (1926) 80 Cal.App. 293 [251 P. 643].)

To be sure, the present case is different in some obvious ways from *Brown, Cooper* and like cases. Unlike a defendant who voluntarily takes the stand and testifies about matters that become the subject of resisted cross-examination, petitioner is not a party to the litigation and did not come forward voluntarily, but in response to a subpoena. His direct testimony regarding published information cannot constitute a waiver of the right to refuse to disclose related information that is unpublished because the shield law explicitly provides that unpublished information remains protected "whether or not related information has been disseminated."[5] (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070.) However, despite these differences, cases such as *Brown* and *Cooper* remain relevant because they illustrate that the right to cross-examination cannot be defeated by a valid claim of privilege, even a privilege as strong as that embodied in the Fifth Amendment.

■ Where a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony on direct. As stated in Witkin: "In either a civil or criminal case, where a party is deprived of the benefits of cross-examination of a witness by *refusal of the witness to answer,* the trial court may *strike out the direct examination.* [Citations.]" (3 Witkin, Cal. Evidence, *supra,* § 1877, p. 1831, original italics.). This rule applies even "where the refusal to answer is

---

[5]For this reason, we reject the Attorney General's argument that petitioner's testimony on direct examination regarding published information constituted a waiver of the protection of the shield law with respect to related information that was unpublished.

based on a valid claim of privilege." (*Ibid.*)[6] Where a witness refuses to submit to proper cross-examination regarding material issues, the striking out or partial striking out of direct testimony is common, and has been allowed even where the result was to deprive a criminal defendant of the fundamental constitutional right to testify in his own behalf. Striking a witness's entire testimony is, of course, a "drastic solution," only to be employed "after less severe means are considered." (*People v. Reynolds, supra,* 152 Cal.App.3d at pp. 47-48; accord, *People v. Hecker* (1990) 219 Cal.App.3d 1238, 1248 [268 Cal.Rptr. 884].)

The logic of this rule applies as much to the situation in which the person who refuses to disclose is a defense witness as to that in which it is the defendant himself, as the refusal of a defense witness to submit to proper cross-examination may corrupt the factfinding process as much as the refusal to submit of the defendant himself. ■ A criminal defendant's federal constitutional right to a fair trial, and specifically the Sixth Amendment right "to have compulsory process for obtaining witnesses in his favor," cannot be deemed to include the right to call a witness who cannot be subjected to proper cross-examination, either because of protections the witness enjoys under the shield law or for any other reason. (See *People v. Hecker, supra,* 219 Cal.App.3d at p. 1248.) There are, in short, exceptionally few caveats to the proposition that the right to introduce evidence necessarily implicates the responsibility to permit it to be fairly tested.[7] As the Supreme Court has said, a criminal defendant " 'has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.' " (*Brown v. United States, supra,* 356 U.S. at p. 155 [78 S.Ct. at p. 627], quoting *Fitzpatrick v. United States, supra,* 178 U.S. 304, 315 [20 S.Ct. 944, 949].) It follows that, where the shield law is invoked to resist proper cross-examination regarding material matters, a trial court may bar the receipt in evidence of the direct testimony to which it relates or strike

---

[6]As Witkin acknowledges, striking the testimony may not suffice if incurable prejudice would result, in which case the proper remedy may be the granting of a mistrial. (3 Witkin, Cal. Evidence, *supra,* § 1877 at p. 1832, citing *People v. Woodberry* (1970) 10 Cal.App.3d 695, 708 [89 Cal.Rptr. 330]; *Gallaher v. Superior Court* (1980) 103 Cal.App.3d 666, 673 [162 Cal.Rptr. 389].)

[7]"Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *E.g., Mancusi* v. *Stubbs,* 408 U.S. 204 [92 S.Ct. 2308, 33 L.Ed.2d 293] (1972). But its denial or significant diminution calls into question the ultimate ' "integrity of the fact-finding process" ' and requires that the competing interest be closely examined. *Berger* v. *California,* 393 U.S. 314, 315 [89 S.Ct. 540, 541, 21 L.Ed.2d 508] (1969)." (*Chambers v. Mississippi, supra,* 410 U.S. at p. 295 [93 S.Ct. at p. 1046].)

such testimony if it has already been given, either entirely or in part.[8] (See *People v. Reynolds, supra,* 152 Cal.App.3d at pp. 47-48; *People v. Hecker, supra,* 219 Cal.App.3d at p. 1248.)

However, where a defendant can show that nondisclosure of unpublished information sought by the People on the cross-examination of a defense witness would result in excluding direct testimony that would materially assist the defense, he should be able to vindicate his federal constitutional right to a fair trial by making showings analogous to those required in *Delaney.* Such showings would oblige the court to compel the disclosure sought from a defense witness by the People, which would permit the defendant to present the favorable testimony of the witness that would otherwise have to be excluded.

It is true that the only showing the defendant can be required to make in order to vindicate his constitutional right relates to the significance to the defense of the published (and therefore unprotected) information he seeks, not the unpublished information the witness refuses to provide, as is conventionally the case in the situations to which *Delaney* applies. But whether the information sought by the defendant is published or unpublished is irrelevant to the point of the *Delaney* inquiry, which is simply to determine whether the *result* of the nondisclosure of protected information will prejudice the defendant's federal constitutional right to a fair trial, which turns on the significance to the defense of *any* information that would have to be excluded if the protections of the shield law were not set aside. By showing that judicial exclusion of unprotected information provided on direct examination would deprive the defendant of a fair trial, the defendant provides a constitutional basis upon which the court can compel the disclosure of protected information.

Where a defense witness protected by the shield law refuses to disclose unpublished information sought by the People on proper cross-examination, the remedy is for the People to move to exclude or strike related testimony sought from the witness on direct examination. The motion should be granted unless the defendant can show that excluding or striking such evidence would deprive him of his federal constitutional right to a fair trial and, if he makes this threshold showing, that his right transcends the

---

[8]If the issue can then be anticipated, the defendant can be required to make this showing by an in limine motion in advance of trial (see 3 Witkin, Cal. Evidence, *supra,* § 2011(c), at p. 1970), or prior to the time the defendant is placed on the stand. "Under appropriate circumstances, a motion in limine can serve the function of a motion to exclude or to strike under Evid[.] C[ode] §353 by allowing the trial court to rule on a specific objection to particular evidence." (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 1997) § 20.2, p. 277.)

conflicting right protected by the shield law. The requisite judicial inquiry is that set forth in *Delaney v. Superior Court, supra*, 50 Cal.3d at pages 807-813, except that the threshold question relates to the importance to the defense of the published information elicited or sought to be elicited by the defendant that would be excluded or stricken if the unpublished information sought by the People were not disclosed.

The necessary two-stage inquiry was never made in this case. The trial court granted the People's initial motion to quash the subpoena because it determined that application of the shield law would not abridge defendant's federal constitutional right to a fair trial. The court provided two reasons for this determination. The first was that, because petitioner was not a percipient witness to the crime charged, he was not an important defense witness. The second was that requiring a journalist to be cross-examined "on the authenticity of statements and the circumstances of statements [he] attribute[d] to witnesses like Ms. Davis . . . is exactly the . . . situation involved in hauling a journalist into court that the shield law was designed to protect against . . . ." This reasoning, which conflates the two stages of the *Delaney* inquiry, does not, in our view, withstand analysis.

We granted a peremptory writ vacating the order quashing petitioner's subpoena because of our disagreement with the trial court's view that petitioner's testimony would not significantly assist the defense because he did not witness the crime charged. It is undisputed that Shayla Davis was a central witness for the prosecution. She was in the apartment at which the shooting occurred, was one of three persons who initially identified defendant from a photo lineup, and was the only eyewitness to the crime able to identify him at trial. Davis's testimony for the prosecution differed in several significant particulars from statements attributed to her by petitioner in his news article. As earlier noted, she testified at trial that she saw only one man break into the apartment and never saw the victim reach for a gun. Confronted on cross-examination with petitioner's article, Davis denied telling him on the day of the killing that she saw three or four persons break into the apartment and saw the victim reach for a gun just before he was shot. The disparity between statements Davis allegedly made to petitioner just hours after the killing and those she made at trial almost two years later provided a basis upon which the defense could impeach her testimony for the prosecution. The fact that petitioner did not himself witness the homicide does not prevent him from effectively undermining her credibility with a jury.[9]

Whether requiring petitioner to testify would be, as the trial court stated, "exactly the situation involved in hauling a journalist into court that the

---

[9]The trial court may have attached significance to the fact that petitioner was not a percipient witness to the crime charged because the reporters in *Delaney*, who were required to disclose unpublished information, were eyewitnesses to the crime charged against the

shield law was designed to protect against," has nothing to do with the threshold question the court was ostensibly addressing, namely, whether application of the shield law would abridge defendant's federal constitutional right to a fair trial, because there is a reasonable possibility excluded evidence will materially assist his defense. The interest the shield law was designed to protect relates instead to the balancing process that constitutes the second stage of the *Delaney* inquiry. But the balancing of interests required by *Delaney* is unnecessary if, as the trial court found, application of the shield law would not substantially hinder the defense.

In the prior writ proceeding commenced by defendant, we vacated the trial judge's order quashing the subpoena simply because, in our view, the trial court improperly resolved the *threshold* question against defendant. However, perhaps understandably given our failure to fully explain ourselves, the trial court interpreted our order as not only resolving the threshold question in defendant's favor but as also resolving the second stage of the *Delaney* inquiry—the "balancing of the defendant's and newsperson's respective, perhaps conflicting, interests" (*Delaney v. Superior Court, supra,* 50 Cal.3d at p. 809)—in his favor and against petitioner. We undertook no such balancing because the record did not permit us to do so. At no time during the proceedings below was the attention of the parties or petitioner ever directed to the four factors pertinent to that balancing. (*Id.* at pp. 809-812). Petitioner was never asked, for example, whether the information he refused to disclose was confidential or sensitive, whether disclosure would require him to breach any confidence or prejudice his ability to gather news in the future, or whether there was any alternative source for the information. For this reason, and because the trial court never purported to balance defendant's right against that of petitioner, we mistakenly assumed it would understand its responsibility to do so before compelling petitioner to disclose the unpublished information sought by the People on cross-examination.

 Because there was never any judicial determination that, on balance, defendant's federal constitutional right supersedes petitioner's state constitutional right, the contempt power could not properly be used to compel petitioner to disclose the unpublished information sought by the People. The situation was complicated by the fact that, inexplicably, the People failed to move to strike the testimony petitioner gave on direct

---

defendant in that case. However, nothing in the opinion in *Delaney* suggests that a newsperson who was not an eyewitness to the crime charged cannot, for that reason, be an important defense witness.

examination as to Shayla Davis after he refused to respond to cross-examination relating to her.[10] Defendant, who received the testimony he wanted, therefore had no reason to show that his federal constitutional right to a fair trial transcended petitioner's right under the shield law; nor was petitioner provided any reason or opportunity to show the opposite.

### III. DISPOSITION

Because the trial court did not determine, and on this record we cannot confidently say, whether petitioner's right must give way to that of defendant, we cannot sustain the order adjudging petitioner in contempt. Accordingly, let a peremptory writ of prohibition issue forever restraining respondent court from enforcing the contempt order at issue herein.

Haerle, J., and Ruvolo, J., concurred.

The petition of real party in interest Darrell Hunter for review by the Supreme Court was denied August 16, 2000.

---

[10]The prosecution did make a motion to strike some of petitioner's direct testimony concerning a prosecution witness other than Shayla Davis. The trial court granted this motion on the grounds that the prosecution had no meaningful right to cross-examination. However, the trial court vacated this ruling after we issued a stay of the contempt order, and the People never renewed their motion to strike.