[No. G031916. Fourth Dist., Div. Three. June 30, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ADRIANA VASCO, Defendant and Appellant.

## COUNSEL

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela A. Ratner-Sobeck and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Davis Wright Tremaine, Kelli L. Sager, Alonzo Wickers IV; Levine Sullivan Koch & Schulz, James E. Grossberg and Ashley I. Kissinger for Freedom Communications and William Rams as Amicus Curiae.

## Opinion

**ARONSON, J.**—A jury convicted defendant Adriana Vasco of the first degree murder of Carolyn Stahl and the second degree murder of her husband, Ken Stahl. Multiple-murder and lying-in-wait special-circumstance allegations were found to be true. She contends the court erroneously applied the newsperson's shield law to restrict her cross-examination of a newspaper reporter who interviewed her in jail. She also contends the evidence is insufficient to support the second degree murder conviction based on a theory it was a natural and probable consequence of the murder she aided and abetted. We affirm.

### I

#### Facts

A. *Overview*

Ken Stahl, a prominent Huntington Beach osteopathic physician, hired a contract killer to murder his wife Carolyn while the couple celebrated her birthday. Stahl's murderous betrayal of his wife was matched on a smaller scale when the gunman turned the weapon on Stahl and opened fire, killing him instantly.

Defendant played a key role in this tragic drama. As Stahl's former mistress and long-time confidante, she was privy to his obsession to murder his wife. She introduced Stahl to her new boyfriend, Tony Satton, when she learned the latter had experience as a hired assailant, and he expressed enthusiasm for undertaking Stahl's homicidal designs. Stahl hired Satton, whose true name is Dennis Godley, to kill Stahl's wife. The murder-for-hire scheme, Godley's lethal deviation from the plan, and defendant's participation in the plot contain all the combustible elements of a Shakespearean tragedy—betrayal, malice, and greed.

A Rancho Mission Viejo security officer found the bodies of Stahl and his wife Carolyn in their car, parked near a call box, on a desolate stretch of the Ortega Highway around 10:00 p.m. on November 20, 1999. Both had been shot to death at close range. The car's engine was running and the car's passenger door was open. Stahl sat on the driver's seat, secured by his seat belt. Carolyn's shoeless foot extended out the front passenger entrance. Sheriff's investigators collected six bullets fired from a .357- or .38-caliber handgun. The absence of shell casings at the scene suggested the assailant used a revolver.

## B. *Defendant's Police Interviews*

Police located defendant's telephone number on Stahl's pager and contacted her three days after the murders. Defendant explained Stahl was a friend she had known since 1992. Responding to the officer's inquiry, she denied they were having an affair. She last spoke to Stahl on the morning before his murder about a computer he was helping her repair. Stahl also mentioned he was taking his wife out for a surprise on her birthday, but had not decided where they were going.

In a second interview three months later, defendant admitted to an affair with Stahl, but explained she ended their romantic liaison three years earlier because she believed Stahl would not leave his wife. Stahl feared a divorce would financially ruin him and did not want to hurt his mother, who was fond of Carolyn. Defendant remained close friends with Stahl, who continued to complain about his wife, but never discussed killing her.

In October 2000, investigating officers reinterviewed defendant. She expanded on the substance of her earlier interviews, describing her romantic involvement with Stahl dating from 1992. Stahl complained about his wife, but felt he could not divorce her because he would lose everything and disappoint his mother. Stahl's wife learned of her husband's affair with defendant, and confronted defendant several times during angry phone conversations. Defendant ended the affair and began a relationship with Greg Stewart, which led to the birth of her daughter. Nevertheless, they remained close and Stahl "was always going to be there" for her. Defendant described how Stahl grew to hate his wife, but denied he ever mentioned having her killed. Defendant denied knowing who killed the couple and claimed she did not introduce Stahl to anyone who would kill his wife. She insisted her conversations with Stahl on the day he was murdered concerned only the repair of a computer and printer, and a discussion of his plans to celebrate his wife's birthday.

## C. *Information Leading to Defendant's Arrest*

Other information surfaced casting doubt on defendant's version of events. Defendant informed her supervisor, Susana Torres-Bivian, she was "dating" Stahl, described their long-term relationship, and conveyed the impression their affair was ongoing. In late summer 1999, defendant told Torres-Bivian she was dating "Tony" (Godley), a maintenance worker in her apartment building. Defendant explained this did not create a conflict with Stahl; the men knew each other and had no problem with the arrangement.

In August 1999, while in a gun store with her daughter's paternal grandfather, James Stewart, defendant pointed to a revolver and revealed she bought

a similar handgun for Tony. When Stewart inquired about the gun after the homicides occurred, defendant claimed Tony returned the weapon because it was not what he wanted. In late September 1999, defendant purchased a semiautomatic rifle, but cancelled the purchase during the 10-day waiting period.

On November 1, 1999, Stahl withdrew $20,000 in cash from his checking account. Based on a review of his bank records, this was an unusual transaction, and his estate's executor never located the funds or matched it to a corresponding expense. Around the same time, defendant arrived at work displaying several pieces of newly-purchased jewelry. Defendant told Torres-Bivian that Tony bought the items for her. She claimed Tony's parents were wealthy and sent him money, but investigators discovered this was untrue.

Investigators learned Stahl had approached Richard Anaya, an electrician and former gang member, and asked him if he knew anyone who would "take care of my wife." Stahl's inquiry to Anaya occurred about a year before the murders. Anaya refused to cooperate.

One or two days before the slayings, defendant cancelled a visit with Nancy Stewart, her daughter's paternal grandmother, explaining she instead took a drive on Ortega Highway because she was feeling "stressed out."

Stahl called defendant's workplace on the Friday afternoon before the murders, but Torres-Bivian told him defendant left work early. He replied he would call her at home. Investigating officers examined Stahl's telephone records and learned he had four or five conversations with defendant on the day of the murders.

On November 20, defendant abruptly changed plans to attend a birthday party with her neighbor, Belen Lopez. She arrived at Lopez's apartment in the early evening accompanied by Godley and explained they had another commitment. During their visit, Godley held an empty shotgun case.

On the Monday after the murders, defendant gave Torres-Bivian a ride to work. Defendant appeared in shock as she related the news of Stahl's death, declaring "they" killed him and his wife. She last spoke with Stahl Saturday morning when he told her he planned to take the "bitch" out for her birthday. Defendant asked Torres-Bivian not to reveal her relationship with Stahl to the police.

After the murders, Godley "sort of disappeared," according to James Stewart. At work, defendant revealed her romantic relationship with "Tony" had faltered because he was seeing another woman. Godley later moved back

to North Carolina, but defendant stayed in contact by phone. In October 2000, officers searched defendant's rented storage unit and found a mug shot of Godley, a picture of defendant and Godley together, and driver's license pictures of Stahl and his wife.

Defendant, while briefly dating Scott Kasof in April or May 2000, discussed her romantic relationship with Stahl and described her disappointment when Stahl would not leave his wife. Defendant related Stahl was unhappily married, but his wife would not give him a divorce. She revealed Stahl discussed his desire to "get rid of his wife," and described how "uneasy" Stahl had been in the two weeks before his murder. Defendant confided she spoke with Stahl on the phone two hours before his death. According to defendant, Stahl felt "uneasy" about an impending meeting and considered calling it off.

Investigators arrested defendant for the murders and booked her into jail on December 27, 2000.

D. *Defendant's Newspaper Interview*

Orange County Register reporter William Rams interviewed defendant at the jail on January 2, 2001, and excerpts from that interview were subsequently published in the newspaper the following day. The published material included either a paraphrased account by Rams or defendant's direct quotations.

Except when the defendant is directly quoted, the following is the reporter's paraphrased summary of defendant's interview. Defendant revealed she was with her ex-boyfriend Godley when he murdered the Stahls, and accompanied him during some of the planning. She recalled Godley had several cell phone conversations with Stahl and was present when, a few days before the murders, Stahl passed Godley $30,000 in a Huntington Beach parking lot. Defendant claimed she had nothing to do with the killings and could not stop them, because Stahl was obsessed with killing his wife and Godley threatened to kill her if she interfered. She explained Stahl hated his wife and spoke about killing her as early as 1993. Defendant revealed the murder had been planned for months, but she successfully delayed a September date and again tried to stop them in the days before the slayings. She pleaded with Stahl "please call it off and he wouldn't listen. I cried please, please? [¶] . . . [¶] [N]obody has any idea how bad I wanted to stop, it." Defendant wanted to contact authorities, but was too frightened because Godley had threatened her and her children.

Defendant stated Godley used a handgun and had to reload because the woman was still alive. Godley turned the gun on Stahl because Stahl failed to

follow Godley's earlier instructions to keep his hands visible, and Godley did not want any witnesses. Rams quoted defendant as stating, "[H]e kept toying around with the gun and told me he was going to pop me at any time[.]" "[F]or some reason he spared my life that day and I don't know why[.]" Defendant told Rams she was still afraid of Godley and felt horrible about the murders.

E. *Defendant's Trial Defense*

Defendant testified her stepfather physically and sexually abused her until she ran away at age 16. She suffered more physical abuse from her first husband during their tumultuous marriage.

She met Stahl in 1992. Both discussed their unhappy marriages and eventually they began their affair. By 1995, defendant formed the impression Stahl wanted to kill his wife. Stahl would not divorce his wife because he was afraid it would ruin him financially. Defendant ended their affair when she realized Stahl would not leave his wife. Shortly afterward, she became romantically involved with Stewart, eventually having his child. Stewart physically abused her throughout their relationship, which ended in 1998. Stahl visited her regularly and provided financial assistance while defendant was involved with Stewart.

Defendant met Godley in September 1999 when he fixed the sink in her apartment. Known to her as Tony Satton, Godley drank and used drugs, and told her he was wanted for robberies in North Carolina. She and Godley became romantic partners. While sharing drinks one evening, Godley revealed he belonged to a group of hired assailants in North Carolina. Defendant told Godley she knew a doctor who wanted to kill his wife. Godley wanted to meet the doctor, rejected defendant's explanation she was joking, and threatened to harm her and her children if she revealed his intentions.

A few days later Godley complained he needed money and directed defendant to contact Stahl. She complied and left the room while Stahl and Godley spoke on the phone. Following Godley's orders, she arranged a meeting between Stahl and Godley in a parking lot. Defendant accompanied Godley to the meeting, and at Godley's direction, spoke with Stahl alone in his car. Stahl gave her an envelope he said contained cash. Defendant informed Stahl "Tony" was "scary" and had threatened her. She asked him not to go through with his plan. Stahl did not respond and defendant gave the money to Godley. After the meeting, Stahl called frequently, sometimes speaking to Godley. She would leave the room and never spoke with Stahl or Godley about the murder plot.

Godley frightened defendant with his threats to harm her and her children. His demeanor, use of drugs, and paranoid behavior alarmed her, and he routinely carried a shotgun at his side.

On November 19th, at Godley's direction, defendant arranged another meeting with Stahl in the same parking lot. Godley and Stahl met, and Stahl told defendant to drive to Ortega Highway and he would follow. Defendant complied, stopping where Godley told her to stop. Stahl pulled in behind her. Defendant spoke with Stahl while Godley, armed with his handgun, took target practice at a sign. Defendant again related Godley's threats to her family and asked Stahl to reconsider, but he did not respond.

The next day Godley showed up at her apartment around 5:00 p.m. carrying a shotgun and ordered her to cancel her plans to attend a birthday party and accompany him back to Ortega Highway. Godley reminded defendant of his earlier threats while pointing the shotgun at her. Defendant objected, but obeyed Godley's orders to drive.

Arriving at Ortega Highway, defendant followed Godley's directions to park in a gas station, where they would wait for Stahl. Spotting Stahl's car, Godley jabbed defendant in the side while holding a gun in his other hand, and told her to follow the car. After a couple of miles, Stahl pulled over, and defendant made a U-turn, stopping in the middle of the street. While defendant remained in the car, Godley approached Stahl's vehicle, and asked if everything was okay. Defendant then heard gunshots and Carolyn's screams. Defendant's car rolled forward as she contemplated leaving, but stopped when she saw Godley pointing the gun at her. He returned to the car, reloaded, and asked defendant where she was going, warning "I was ready to pop you." Godley walked over to Stahl's car, fired more gunshots and returned to defendant's car. As defendant drove, Godley explained he shot Stahl to eliminate a witness and because he did not follow Godley's instructions to keep his hands on the steering wheel. Defendant testified she did not believe the murders would take place and did not intend the deaths of either victim.

Dr. Nancy Kaser-Boyd, a clinical psychologist specializing in family violence, testified defendant suffered from battered women's syndrome and posttraumatic stress disorder, stemming from repeated violent acts against her. Defendant exhibited common features of the syndrome, such as "learned helplessness" and denial.

Defense counsel argued defendant, suffering from battered women's syndrome, lacked the requisite intent for murder and the special circumstances allegation. Intimidated by Godley's violence and threats, her alleged criminal

acts and omissions exhibited "learned helplessness" and denial, features of the syndrome, and demonstrated she did not intend to help Godley carry out the murder plot.

## II

### The Shield Law and Defendant's Right to a Fair Trial

■ The California shield law (Cal. Const., art. I, § 2, subd. (b)) provides newspersons immunity from contempt proceedings for refusing to disclose the sources of any information obtained while working as a newsperson "or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public."[1] Thus, courts may not hold newspersons in contempt for refusing to disclose unpublished information or the source of published or unpublished information. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 796–797 [268 Cal.Rptr. 753, 789 P.2d 934] (*Delaney*).)

Newspaper reporter Rams invoked the protection of the shield law when the prosecution subpoenaed him to testify about his interview of defendant. The prosecution sought to elicit only published information concerning defendant's account of the murders, but defendant proposed to cross-examine Rams about unprivileged information, such as asking Rams to reveal any of defendant's mitigating statements omitted from the articles. The trial court

---

[1] The voters incorporated the shield law into the California Constitution in 1980. Article 1, section 2, subdivision (b), provides: "A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, shall not be adjudged in contempt by a judicial, legislative, or administrative body, or any other body having the power to issue subpoenas, for refusing to disclose the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public. [¶] Nor shall a radio or television news reporter or other person connected with or employed by a radio or television station, or any person who has been so connected or employed, be so adjudged in contempt for refusing to disclose the source of any information procured while so connected or employed for news or news commentary purposes on radio or television, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public. [¶] As used in this subdivision, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated."

Evidence Code section 1070 is the statutory counterpart to California Constitution, article I, section 2, subdivision (b), and contains nearly identical wording. To avoid needless repetition, we refer only to the constitutional provision.

permitted only questions concerning information published in the articles, and sustained Rams's objections to defendant's proposed cross-examination covering unpublished information.

Defendant contends the trial court erred in upholding the reporter's shield law immunity and complains the trial court's restrictions violated her Sixth Amendment right to confrontation and her Fourteenth Amendment due process right to a fair trial. Alternatively, defendant contends the trial court erred in permitting Rams to testify rather than striking his testimony. We conclude defendant's confrontation and due process rights were not infringed because defendant failed to show a reasonable possibility the information she sought to elicit from Rams would materially assist her defense, as required under *Delaney*. We also conclude any conceivable error in not striking the testimony was harmless beyond a reasonable doubt.

A. *Procedural Background*

The prosecution subpoenaed Rams for defendant's trial. Rams moved to quash, arguing newspaper reporters possess a First Amendment qualified immunity from testifying. Alternatively, Rams requested a protective order limiting the questions of both parties to information published in the newspaper articles. The trial court denied the motion to quash but preliminarily limited any inquiry to published information only. The court reserved ruling on whether defendant could ask Rams about unpublished information protected under the shield law.

At the trial court's request, defense counsel submitted a list of approximately 70 proposed cross-examination questions he intended to ask Rams at trial. The inquiries covered three broad areas: (1) Rams's interviewing procedure, e.g., whether he took notes or tape-recorded the interview, or whether anyone else accompanied him to the interview; (2) how Rams obtained defendant's consent to the interview; and (3) other exculpatory or mitigating statements defendant made that were not used in the newspaper articles, e.g., statements regarding Godley's threats to defendant, and defendant's efforts to dissuade Stahl from carrying out the murder plan. Many of the proposed questions focused on whether the statements attributed to defendant were direct quotes or Rams's editorial synopsis of her remarks.

The trial court held an extensive pretrial hearing on whether to permit defendant to cross-examine Rams on unpublished information.[2] Rams testified, and answered certain defense questions, such as providing the date he

---

[2] The court explained, "I need to make a record as to what questions that you would ask or seek to ask, make whatever rulings are necessary and then have the testimony tailored as to what questions will be allowed so we don't get into a dispute in front of the jury . . . ."

interviewed defendant and admitting he reviewed only the newspaper articles to prepare for his testimony. The trial court sustained Rams's objections to the remaining questions as calling for unpublished information. The court required Rams to identify which statements in his articles quoted Vasco directly and which statements paraphrased her, but the court sustained objections to defendant's request Rams identify the exact quotation he paraphrased. The court also ruled Rams could decline to answer questions on how he obtained defendant's permission to interview her, whether he took notes or tape-recorded the interview, or whether defendant made other exculpatory or mitigating statements not used in the articles.

In denying defendant's request to cross-examine Rams on unpublished material, the trial court found defendant failed to meet the threshold showing required under *Delaney*. "The reason that I have not allowed questioning of this witness as to unpublished material is largely based on what has been the offer of proof by counsel for defendant that the alleged defendant's involvement is a byproduct of the codefendant's acts, conduct, threats, and the position of vulnerability that your client found herself in at the time of the shootings. [¶] It appears from the material that was published that the jury will have that evidence before them that at the time of January, 2001, in a separate interview between your client and the reporter, she voiced these— what constitutes her defense. [¶] And so, in fact, the article is more replete with that material than any material that incriminates her."

Before Rams testified at trial, counsel renewed his objection: "After evaluating the manner in which . . . Rams testified and in—coupled with the court's limitations on my ability to cross-examine him, I don't think I will be able to ask any questions of this witness. [¶] I think the effect of my cross-examining him to the limited extent the court would allow it would really be so ineffectual as cross-examination that rather than testing what he has to say it would simply make the jury think that what he has to say is absolutely accurate and reliable. [¶] I think that the court trying to comply with the Supreme Court rulings in this area is allowing this witness to have a false aura of reliability, credibility and truth. So I—again I object to his testifying because it absolutely denies her right to . . . cross-examine a witness."

The trial court replied defense counsel could cross-examine the reporter within parameters of the shield law, and counsel had the opportunity to elicit on cross-examination several of defendant's quotations in the articles that "would be of assistance to your client. [¶] However, for tactical reasons, if you decide to not ask those questions, no one is going to fault you." The court overruled defendant's objection, "to the extent that your objection is

that you are being precluded from pointing out matters that the witness can testify to that would be of assistance to your client and . . . consistent with [her] defense . . . ."

Before Rams testified, the court informed the jury the parties held hearings "about the areas that counsel can examine." The court introduced the lawyer representing Rams, and the prosecution asked questions covering pertinent portions of the articles. Defense counsel elected not to cross-examine Rams.

B. *Reconciling a Criminal Defendant's Right to a Fair Trial and Shield Law Protection for Newspersons*

The shield law provides absolute rather than qualified protection in immunizing a newsperson from contempt for not revealing unpublished information. (*Miller v. Superior Court* (1999) 21 Cal.4th 883, 890 [89 Cal.Rptr.2d 834, 986 P.2d 170] (*Miller*).) " ' "Since contempt is generally the only effective remedy against a nonparty witness, the California enactments [California Constitution, article I, section 2, subdivision (b), and Evidence Code section 1070] grant such witnesses *virtually absolute protection* against compelled disclosure." [Citation.] . . .' " (*Id.* at pp. 890–891.) This protection " 'provides an immunity from being adjudged in contempt; *it does not create a privilege.*' " (*Delaney, supra,* 50 Cal.3d at p. 797, fn. 6, original italics.) To qualify for shield law protection, the newsperson must show "that he is one of the types of persons enumerated in the law, that the information was 'obtained or prepared in gathering, receiving or processing of information for communication to the public,' and that the information has not been 'disseminated to the public by the person from whom disclosure is sought.' " (*Id.* at p. 805, fn. 17.)

Once established, the shield law "may be overcome only by a countervailing federal constitutional right." (*Miller, supra,* 21 Cal.4th at p. 897.) Defendant's constitutional right to a fair trial may displace the newsperson's shield law immunity if defendant meets the burden of demonstrating nondisclosure would deprive defendant of her due process right to a fair trial. (*Delaney, supra,* 50 Cal.3d at p. 805.) To meet this burden, defendant must show "a reasonable possibility the information will materially *assist his defense.*" (*Id.* at p. 809.) The court emphasized the requested information need not lead to defendant's exoneration. For example, a defendant's right to a fair trial includes disclosure of evidence that may establish an "imperfect defense," a lesser included or lesser related offense, or a lesser degree of the same crime; impeach a prosecution witness; or, in capital cases, establish mitigating circumstances. (*Ibid.*) While "defendant's showing need not be detailed or specific, . . . it must rest on more than mere speculation." (*Ibid.*)

■ If a defendant satisfies the threshold showing, the court proceeds to the second stage of the inquiry and balances "the defendant's and newsperson's respective, perhaps conflicting, interests." (*Delaney, supra,* 50 Cal.3d at p. 809.) The court must consider the following factors: (a) whether the unpublished information is confidential or sensitive so that disclosure might threaten the newsperson's access to future sources; (b) the interests protected by the shield law and whether other circumstances demonstrate no adverse consequences to disclosure, as when the defendant is the source of information; (c) the importance of the information to the defendant; and (d) whether there is an alternative source for the unpublished information. (*Id.* at pp. 810–811.)

With these principles in mind, we now consider whether application of the shield law in defendant's case denied her right to a fair trial.

## C. *Applying* Delaney's *Analytical Framework*

Defendant contends the trial court denied her due process right to a fair trial when it prohibited her from cross-examining Rams on unpublished information he gathered in writing his articles about the murders. Defendant also urges us to review the trial court's *Delaney* ruling de novo. *Delaney* did not decide which standard of review to adopt for shield law cases "because . . . we have reviewed the record, and we independently conclude without difficulty that it fully supports the municipal court's thoughtful decision." (*Delaney, supra,* 50 Cal.3d at p. 816.) We also decline to decide which standard applies because, as in *Delaney*, we independently conclude the record supports the trial court's decision that defendant failed to satisfy *Delaney*'s threshold test. We now turn to *Delaney*'s analytical approach.

### 1. *Did Newspaper Reporter Rams Establish the Foundational Requirements for Invoking the Shield Law?*

The burden initially rests on the newsperson to satisfy the foundational requirements for relying on the shield law. Here, it is undisputed Rams established the requisite foundation. Rams filed a declaration stating that while working as an Orange County Register newspaper reporter he obtained information concerning defendant's involvement in the murders. He revealed that "[s]ubstantial portions of the information gathered for the articles are unpublished," and "have not [been] disseminated . . . to the public." At the trial, defendant did not dispute Rams established the necessary foundation to invoke the shield law, and does not contest this issue on appeal.[3] Consequently, we turn to the next prong in the analysis.

---

[3] Defendant does not contend Rams could not invoke the shield law because defendant was both the source of the information and the person seeking its disclosure. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 56, fn. 3 [47 Cal.Rptr.2d 843, 906 P.2d 1129] (*Sanchez*).)

### 2. Did Defendant Show a Reasonable Possibility Cross-examining Newspaper Reporter Rams About Unpublished Information Would Have Materially Assisted the Defense?

Rams gained immunity from contempt and the right to withhold unpublished information once he established the necessary foundation for invoking the shield law. To overcome this showing, defendant was required to demonstrate a reasonable possibility the undisclosed information would materially assist her defense. (*Delaney, supra,* 50 Cal.3d at p. 808.)

Defendant contends she satisfied *Delaney*'s threshold requirement when she informed the trial court her unpublished statements to Rams could support her defense she lacked the requisite criminal intent and suffered from battered women's syndrome. Although "[t]his should have been enough to warrant disclosure," defendant also argues "the very fact that Rams paraphrased much of the interview independently satisfies the *Delaney* requirement . . . ." Finally, at oral argument, defendant maintained her pretrial written list of proposed questions constituted her offer of proof. The Attorney General argues *Sanchez, supra,* 12 Cal.4th 1, is on point and requires rejection of defendant's claim. We agree *Sanchez* is dispositive and conclude defendant failed to satisfy *Delaney*'s threshold test.

In *Sanchez,* a newspaper reporter interviewed the defendant five separate times concerning the circumstances leading to multiple murder charges. One article reported the defendant's admission he was a " 'triple murderer' " and that the victims were killed for their Social Security checks. Earlier articles based on the same interviews reported the defendant " 'did not actually kill' "

---

*Delaney* considers this fact merely a factor in balancing the newsperson's and defendant's rights, but *Sanchez* hinted this might remove a newsperson's shield law protection altogether. (Compare *Delaney, supra,* 50 Cal.3d at p. 810 [whether defendant seeking disclosure is also the source of the information is a factor weighed in balancing test but considered only *after* the defendant has met the threshold requirement] with *Sanchez, supra,* at p. 56, fn. 3 [court declined to address "the issue whether the fact that defendant himself was the source of some of the information rendered it *outside* the protection of the shield law" (italics added)].)

The issue is troublesome. The shield law's purpose is to "protect a newsperson's ability to gather and report the news." (*Delaney, supra,* 50 Cal.3d at p. 806, fn. 20.) Where the defendant is both the source of the reporter's information and the person requesting the disclosure, there is no risk the reporter's source (the defendant) will complain her confidence has been breached. (*People v. Sapp* (2003) 31 Cal.4th 240, 273 [2 Cal.Rptr.3d 554, 73 P.3d 433].) Nor is the separate policy of safeguarding press autonomy in any way compromised. (See *Miller, supra,* 21 Cal.4th at p. 898.) And, where the defendant is the reporter's source of information, there appears no reason to assume disclosure would hinder the reporter's ability to gather news in the future. But under *Delaney,* we may only consider this factor in the balancing stage. If the defendant fails to meet the threshold test, as here, this factor plays no part in the equation. But for the foregoing reasons, it may be argued this factor also should be considered in determining whether the newsperson has established the foundational requirements for shield law protection.

two of the victims, but felt " 'he deserves to die because he was present when the slaying happened, because he helped the killers and because he didn't intervene to save the couple, who had been kind to him for years.' " The defendant explained he had smoked PCP before committing the crimes and " ' "I was scared . . . . It was just that I felt fear, and I didn't know how to respond to it. . . ." ' " The defendant claimed he was not guilty of the other homicide.

The prosecution called the reporter during the guilt phase to ask only about information published in the newspaper. The trial court sustained objections based on the shield law when the defendant asked the reporter if the defendant's interviews were taped. The trial court rejected the defendant's argument he had a Sixth Amendment right to cross-examine the reporter, prohibited the defendant from asking about unpublished information and denied his request to strike the reporter's direct testimony. (*Sanchez, supra*, 12 Cal.4th at p. 50.)

In *Sanchez*, the defendant claimed he met *Delaney*'s threshold test for overcoming the shield law and the trial court violated his Sixth Amendment right to confrontation when it granted the newspaper reporter immunity. The defendant argued he established a reasonable possibility the undisclosed information would materially assist his defense when he asserted the following: " 'Unlike other statements attributed to [defendant] in the [newspaper] article, [the reporter's] "triple murder" assertion was not a direct quotation. Rather, it was a conclusion drawn by [the reporter]. [The reporter's] unpublished material might have shown that his "triple murderer" testimony was his own interpretation of [defendant's] account, not an actual admission. Moreover, discovery and cross-examination might have proven that [the reporter's] conclusion was not supported by the interviews. . . .' " (*Sanchez, supra,* 12 Cal.4th at p. 57.) The defendant also claimed interview tapes " 'might have shown' " the defendant did not make the admissions the reporter attributed to him, and therefore bolster his argument the evidence was insufficient. (*Ibid.*)

The Supreme Court concluded the defendant's evidence "consists of nothing more than self-serving statements that a court could reasonably conclude were either too speculative to assist defendant or would harm, rather than materially assist, the defense." (*Sanchez, supra,* 12 Cal.4th at p. 57.) The court observed that "defendant never shows how the information he sought would materially assist his defense, or how it differed in content from the testimony and published information available for cross-examination, including defendant's statements he was scared, that he had taken phencyclidine (PCP), and that he had not murdered anyone." (*Ibid.*) Consequently, the court rejected the defendant's claim he satisfied *Delaney*'s threshold requirement and that he was denied his right to confront and cross-examine the reporter. (*Ibid.*)

Here, defendant also contends she met *Delaney*'s threshold test and the trial court's restriction of her cross-examination of Rams violated her Sixth Amendment confrontation rights. As in *Sanchez*, defendant complains the reporter paraphrased her statements, and argues cross-examination would have revealed her exact statements, which, in turn, might have bolstered her lack of intent defense. She argues disclosure of any notes or tape-recorded interview of defendant may have revealed her exact statements. She also asserts cross-examining Rams about her demeanor would have corroborated defendant's fear of Godley and the description of his threats. She surmises cross-examination may have revealed Rams used other information sources besides defendant. Finally, she argues cross-examination may have shown Rams coerced her into making involuntary admissions.

Recently, in *People v. Ramos* (2004) 34 Cal.4th 494, 525–526 [21 Cal.Rptr.3d 575, 101 P.3d 478] (*Ramos*), the Supreme Court rejected claims similar to those lodged here. In *Ramos*, the defendant sought disclosure of a newsreporter's unpublished information concerning the reporter's interview of defendant. Specifically, the defendant sought the reporter's interview notes to "validate [defendant's] psychiatric disorder." The court concluded the defendant failed to meet *Delaney*'s threshold test, concluding his showing rested on "mere speculation" and the evidence "does not suggest the notes contain anything of substance that the jury had not already heard." (*Id.* at p. 527.)

Defendant's assertions parrot those the defendants lodged in *Sanchez* and *Ramos*, and amount to nothing more than rank speculation. Much of the information she sought to elicit was cumulative of other admitted evidence. Rams recounted defendant's statements describing her fear of Godley and his violent conduct. Other witnesses corroborated Godley's violent character, and defendant's expert explained her battered women's syndrome defense. Defendant never claimed Rams's account of his interview with her was untruthful or inaccurate. Thus, defendant's argument, stripped of its gloss, is merely a request to elicit additional corroborating information from Rams. As in *Sanchez*, defendant failed to explain how this information would have assisted her defense, or how it differed from other mitigating evidence presented at trial. Finally, we note defendant filed no declarations or investigative reports to support her *Delaney* showing. We also reject the notion a lengthy list of detailed questions amounts to an offer of proof, or satisfies defendant's burden "to make the required showing." (*Delaney, supra,* 50 Cal.3d at p. 809; see also *In re Mark C.* (1992) 7 Cal.App.4th 433, 444 [8 Cal.Rptr.2d 856] [offer of proof must set forth the substance and purpose of the evidence]; *People v. Allen* (1986) 42 Cal.3d 1222, 1270, fn. 30 [232 Cal.Rptr. 849, 729 P.2d 115] [general rule offer of proof not required for cross-examination does not apply where trial court has overlooked the question's probable relevance or invites counsel to suggest a theory of relevance].)

Measured under the *Sanchez* standard, defendant failed to show a reasonable possibility the unpublished information would materially assist her defense. Consequently, we need not consider the second *Delaney* prong requiring a balancing of factors to determine whether disclosure of the unpublished information was required. (*Sanchez, supra,* 12 Cal.4th at p. 58, fn. 4; *Ramos, supra,* 34 Cal.4th at p. 527.)

D. *The Remedy of Excluding or Striking the Newsperson's Testimony When Shield Law Immunity Is Validly Asserted During Cross-examination*

Alternatively, defendant contends the trial court erred by failing to strike Rams's direct testimony or exclude him from testifying altogether. Where a criminal defendant fails to satisfy *Delaney*'s threshold test, the Attorney General argues the appropriate remedy is to limit the newsperson's testimony to published information, as in *Sanchez.* Before turning to this issue, we must first determine whether defendant made a motion to strike Rams's direct testimony.

Invoking the shield law, Rams declined at a pretrial hearing to answer defendant's cross-examination questions concerning unpublished information. When the trial court found defendant failed to satisfy *Delaney*'s threshold test, defendant argued the ruling violated her Sixth Amendment right to cross-examination and therefore moved to exclude Rams's entire testimony. "If a witness frustrates cross-examination by declining to answer some or all of the questions, the court may strike all or part of the witness's testimony. [Citation.] From this rule it follows logically that if . . . the court determines in advance that the witness will refuse to answer such questions, the court may decline to admit the testimony in the first instance." (*People v. Price* (1991) 1 Cal.4th 324, 421 [3 Cal.Rptr.2d 106, 821 P.2d 610].) Defendant's motion to exclude Rams's entire testimony was designed to prevent the witness's testimony from influencing the jury. Thus, the broader remedy of exclusion encompasses a motion to strike, and therefore defendant did not waive the issue.

Based on *Fost v. Superior Court* (2000) 80 Cal.App.4th 724 [95 Cal.Rptr.2d 620] (*Fost*), defendant argues the trial court abused its discretion in failing to strike or exclude Rams's testimony. In *Fost*, the prosecution's principal eyewitness in a special circumstances murder case made certain statements for a newspaper article about the crime. The witness's testimony differed from her statements in the article. To impeach the witness, the defendant called the newspaper reporter only to authenticate the information published in the article. Invoking the shield law, the reporter refused to answer several of the prosecutor's cross-examination questions about unpublished information. The trial court held the reporter in contempt when the reporter failed to

comply with the court's order to answer the questions. The Court of Appeal granted the reporter's writ petition to prohibit the trial court from enforcing its contempt order because the court failed to balance the competing constitutional rights. (*Id.* at pp. 739–740.)

The focal point in *Fost* was the prosecutor's effort to overcome the shield law and cross-examine the reporter on unpublished information. *Miller, supra,* 21 Cal.4th 883, appeared to foreclose the prosecutor's attempt. *Miller* held that the prosecution's due process rights under the state Constitution do not include the right to use contempt sanctions to compel newspersons to disclose unpublished information obtained while covering the news. "The fact that the assertion of this immunity might lead to the inability of the prosecution to gain access to all the evidence it desires does not mean that a prosecutor's right to due process is violated, any more than the assertion of established evidentiary privileges against the prosecution would be a violation." (*Id.* at p. 898.) Only the defendant can overcome shield law protection by demonstrating that nondisclosure would violate the defendant's federal constitutional right to a fair trial. (*Fost, supra,* 80 Cal.App.4th at p. 737; *Delaney, supra,* 50 Cal.3d at p. 805.) Thus, the prosecutor in *Fost* could not compel the newspaper reporter to disclose on cross-examination unpublished information about the articles, even if it would materially assist the prosecutor's case.

There was one more arrow in the prosecution quiver, however. Because the prosecution was denied the benefits of cross-examination when the reporter refused to answer questions on unpublished information, the prosecutor moved to strike the witness's entire testimony. The court in *Fost* agreed this was an appropriate and well-established remedy, even if the witness's refusal was based on a valid privilege. (*Fost, supra,* 80 Cal.App.4th at pp. 735–736.) The court explained, "[a] criminal defendant's federal constitutional right to a fair trial, and specifically the Sixth Amendment right 'to have compulsory process for obtaining witnesses in his favor,' cannot be deemed to include the right to call a witness who cannot be subjected to proper cross-examination, either because of protections the witness enjoys under the shield law or for any other reason." (*Id.* at p. 736.) In other words, a defendant's Sixth Amendment right to call favorable witnesses applies only if those witnesses submit to cross-examination. (*Id.* at p. 732.) "It follows that, where the shield law is invoked to resist proper cross-examination *regarding material matters,* a trial court may bar the receipt in evidence of the direct testimony to which it relates or strike such testimony if it has already been given, either entirely or in part. . . ." (*Id.* at pp. 736–737, fn. omitted, italics added.)

*Fost* explained there was one exception to the general remedy of striking the direct testimony of a witness invoking the shield law: "[W]here a

defendant can show that nondisclosure of unpublished information sought by the People on the cross-examination of a defense witness would result in excluding direct testimony that would materially assist the defense, [defendant] should be able to vindicate his federal constitutional right to a fair trial by making showings analogous to those required in *Delaney*." (*Fost, supra,* 80 Cal.App.4th at p. 737.)[4] In sum, *Fost* held that the prosecution may move to exclude or strike the entire testimony of a witness who invokes the shield law and refuses to answer the prosecutor's cross-examination questions. *Fost* concluded the motion should be granted "unless the defendant can show that excluding or striking such evidence would deprive him of his federal constitutional right to a fair trial and, if he makes this threshold showing, that his right transcends the conflicting right protected by the shield law." (*Id.* at pp. 737–738.)

Defendant argues the circumstances in *Fost* are identical to those in her case, except that defendant, rather than the prosecutor, moved to exclude or strike the newspaper reporter's testimony when the reporter refused to answer defendant's cross-examination questions. Seeing no other differences, defendant urges us to follow *Fost*'s reasoning and conclude the trial court abused its discretion in failing to exclude or strike Rams's testimony. True, rights and obligations applying to both parties are enforced neutrally, "[w]hat is sauce for the People's goose is sauce for the defendant's gander." (*Nienhouse v. Superior Court* (1996) 42 Cal.App.4th 83, 92 [49 Cal.Rptr.2d 573] ["if the People can elicit incriminating hearsay from a law enforcement officer, the defense can elicit exculpatory hearsay from law enforcement officer" on probable cause determination at preliminary hearing].) But to apply *Fost* here requires an analysis of how *Delaney* and *Miller* affect the respective parties' rights and interests.

■ The prosecution has no due process right to overcome a newsperson's shield law immunity and force disclosure of unpublished information, even if the undisclosed information is crucial to the prosecution's case. (*Miller, supra,* 21 Cal.4th at p. 887.) Under *Fost*, any right the prosecution has to uncover material undisclosed information is "derived from the defendant's Sixth Amendment right to call witnesses in his favor." (*Fost, supra,* 80 Cal.App.4th at p. 732.) But this right applies only if the witness submits to

---

[4] *Fost* required the defendant to meet the *Delaney* requirements even though the defendant had not sought to obtain unprivileged information on the newspaper reporter's direct examination. If the defendant satisfies the *Delaney* test, the prosecution may inquire about unpublished information on cross-examination. Amicus curiae argue this portion of *Fost* is inconsistent with *Miller* and promotes a constitutionally inferior interest—the prosecutor's cross-examination rights—at the expense of the newsperson's constitutional right not to disclose unpublished information. As amicus curiae acknowledges, however, we need not decide the issue because, unlike the scenario in *Miller,* the prosecution here sought and elicited from Rams only published information on direct examination.

cross-examination. Thus, the prosecution may cross-examine the witness on unpublished information only if the defendant demonstrates the reporter's direct testimony assists his defense and therefore cannot be stricken without violating the defendant's right to a fair trial. (*Id.* at p. 737.) If the defendant fails to make this showing, the prosecution may not cross-examine the newsperson on unpublished information, but may move to strike the witness's testimony.

In contrast, defendant's right to cross-examine newspersons on unpublished information is not a derivative right, but directly stems from a criminal defendant's Sixth Amendment guarantee. Defendant has a right to overcome shield law immunity and force disclosure of unprivileged information if defendant meets the *Delaney* standard. But if defendant fails to show a reasonable possibility the undisclosed information will materially assist the defense, it follows that defendant has no right to elicit unpublished information on cross-examination and therefore does not suffer prejudice in the same manner as the prosecution when it is denied cross-examination on issues crucial to its case.

Other interests may support defendant's right to exclude or strike the newsperson's testimony, however. Cross-examination serves other purposes besides eliciting additional information. Indeed, "[i]ts chief purpose is 'to test the credibility, knowledge and recollection of the witness. . . .' " (*Fost, supra,* 80 Cal.App.4th at p. 733.) The cross-examiner " 'often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily explanatory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. [Citations.] It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. . . .' " (*Id.* at p. 734.) Here, defendant's failure to pass *Delaney*'s threshold test bars her from eliciting unpublished information from a newsperson who validly asserts shield law protection. Defendant retained the right to test the witness's credibility, knowledge, and recollection, but was thwarted in doing so by the witness's refusal to answer questions about the undisclosed information. Excluding or striking the witness's testimony may be necessary to vindicate these cross-examination purposes.

But resolution of these issues must await another day. Here, we need not decide whether the trial court erred in failing to exclude or strike the reporter's testimony because any conceivable error was harmless beyond a reasonable doubt.

Defendant claims the trial court's failure to exclude or strike Rams's testimony was prejudicial error and forced her to testify. But defendant's

direct testimony did not once refer to Rams's newspaper article. The issue surfaced only on cross-examination when she conceded Rams accurately reported her statements, with one exception.[5] Because defendant testified in more detail to essentially the same facts Rams reported in his stories, it is reasonable to assume her testimony was not prompted by the need to explain any inaccuracies in the newspaper articles. We therefore conclude her failure to discuss Rams's newspaper articles on direct examination demonstrates her decision to testify was not causally linked to the court's failure to exclude Rams's testimony.

Other evidence connected defendant to the murders. She lied to police about her involvement with Stahl, the number of telephone calls she received from him on the day he was killed, and his desire to hire someone to kill his wife. Police discovered in defendant's storage unit driver's license identification photographs of Stahl and his wife and a picture of defendant and Godley together. Defendant often expressed enmity toward Stahl's wife. Shortly after Stahl withdrew $20,000 from his bank account, defendant arrived at work adorned with new jewelry from Godley. A few months before the murders, she bought Godley a revolver, the same type of handgun used in the homicides. On the evening of the slayings, she abruptly canceled plans to attend a party and left with Godley. This evidence, coupled with defendant's testimony, demonstrates any error in failing to exclude Rams's testimony was harmless.

## III

### SUFFICIENCY OF EVIDENCE TO SUPPORT DEFENDANT'S SECOND DEGREE MURDER CONVICTION BASED ON THE DOCTRINE OF NATURAL AND PROBABLE CONSEQUENCES

Defendant contends the evidence is insufficient to support defendant's second degree murder conviction based on a theory Stahl's murder was a natural and probable consequence of his wife's murder. We disagree.

█ We apply the following standard to determine whether the evidence is sufficient to support defendant's murder conviction: "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1022 [248 Cal.Rptr. 568, 755 P.2d 1017].) Evidence must be reasonable, credible and of solid value to satisfy the substantial evidence test, and "[t]his standard applies

---

[5] Defendant complained she did not tell Rams she was present during some of the "planning," but informed him she was present when Stahl and Godley were "talking."

whether direct or circumstantial evidence is involved." (*People v. Catlin* (2001) 26 Cal.4th 81, 139 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

Because we must draw all inferences in support of the judgment, defendant "bears an enormous burden" when challenging the sufficiency of the evidence. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330 [6 Cal.Rptr.3d 271].) It is the exclusive province of the trier of fact to assess the credibility of the witnesses, resolve conflicts in the testimony and weigh the evidence. (*Ibid.*) Thus, " ' "[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1054 [99 Cal.Rptr.2d 1, 5 P.3d 68].) With these principles in mind, we turn to defendant's attack on the sufficiency of the evidence.

The elements of aider and abettor liability for murder on the natural and probable consequences theory are the following: "the trier of fact must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime. But the trier of fact must also find that (4) the defendant's confederate committed an offense *other than* the target crime; [fn. omitted] and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*People v. Prettyman* (1996) 14 Cal.4th 248, 262 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) The issue "is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1133 [77 Cal.Rptr.2d 428, 959 P.2d 735], original italics.)

Here, defendant admitted she knew Stahl hired Godley to kill Stahl's wife, and there was ample evidence defendant facilitated the murder by introducing Godley to Stahl and purchasing for Godley the same type of handgun used in the slayings. Defendant argues it was not objectively reasonable to anticipate Godley would also turn his weapon on Stahl, the man who hired Godley to commit the target offense. But defendant knew firsthand Godley was a dangerous, violent paranoid sociopath. He informed her early in their relationship he was a North Carolina fugitive wanted for robberies. She knew he had worked as a hired assailant and associated with hired killers. He often carried a shotgun at his side, and threatened to kill defendant and her children if she revealed his past or his murder plans. The jury reasonably could conclude it was foreseeable such a violent individual would have an incentive to eliminate Stahl as a witness after Stahl paid him the entire amount under

the murder contract. Drawing all inferences in favor of the judgment, as we must, we conclude substantial evidence supports the conviction.

## IV

### DISPOSITION

The judgment is affirmed.

Bedsworth, Acting P. J., and O' Leary, J., concurred.

A petition for a rehearing was denied July 15, 2005, and appellant's petition for review by the Supreme Court was denied October 19, 2005. Kennard, J., did not participate therein.