Filed 3/3/16  P. v. Soto CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALEXANDER SOTO, DAVID ANTHONY LUNA, JEREMY ERIN VALDEZ,<br><br>    Defendants and Appellants. | G049639 (Consol. w/ G050098, G050120)<br><br>(Super. Ct. No. 10WF3109)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

The opinion filed February 3, 2016, is modified as follows:

1.      Near the bottom of page 10, in the sentence that states, "Luna, for example, cites testimony in which alibi witnesses claimed he was not present at the shooting," change the word "cites" to "offered".

2.      In the top half of page 11, delete the word "repeatedly" from the following sentence:  "Each repeatedly yelled out 'Crow Village,' and so did Luna from a supporting position immediately behind them."

3.      At the bottom of page 15, *before* the last sentence on the page, which begins, "An objection would have been futile . . . ," insert a new sentence, as follows: "Luna also argues the expert improperly opined on Luna's subjective knowledge and intent to commit the offenses of murder, shooting at an occupied vehicle, and assault with a deadly weapon for the benefit of a criminal street gang and to promote the felonious conduct of its members."

4.     On page 16, at the end of the paragraph concluding Part II.B.2., insert a new sentence, as follows:  "Luna's challenge to the sufficiency of the evidence supporting his conviction for active participation in a criminal street gang therefore also fails."

5.     At the bottom of page 18, change the citation sentence "(CALCRIM No. 200)" to "(CALJIC No. 17.31.)"

6.     In the sentence spanning pages 18 and 19, replace the clause "and the prosecution made no suggestion or attempt to prove Luna fled" with the new clause "and because no evidence suggested Luna fled, it is not reasonably likely the jury applied the flight instruction to him."

7.     Near the top of page 19, following the citation string that begins "(Evid. Code, § 355 . . . )," insert a new sentence and citation string, as follows:

> Luna's IAC claim based on counsel's failure to request a pinpoint instruction or modification fails precisely because it is not likely the jury applied the instruction to him.  (*People v. Kipp* (1988) 18 Cal.4th 349, 366 ["If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the [IAC] claim on that ground without determining whether counsel's performance was deficient"].)

The modifications do not change the judgment.  Respondent's and Appellant Luna's rehearing petitions are denied.


ARONSON, ACTING P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.

2

Filed 2/3/16  P. v. Soto CA4/3  (unmodified version)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALEXANDER SOTO, DAVID ANTHONY LUNA, JEREMY ERIN VALDEZ,<br><br>    Defendants and Appellants. | G049639 (Consol. w/ G050098, G050120)<br><br>(Super. Ct. No. 10WF3109)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Francisco P. Briseño, Judge.  Affirmed in part, with directions, and reversed in part.

Joanna McKim, under appointment by the Court of Appeal; Ahrony Graham & Zucker, Ian Graham and Bruce Zucker for Defendant and Appellant Alexander Soto.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant David Anthony Luna.

Mark W. Fredrick for Defendant and Appellant Jeremy Erin Valdez.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, Charles C. Ragland, Felicity Senoski, and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

\*　　　　\*　　　　\*

A jury convicted Alexander Soto, David Anthony Luna, and Jeremy Erin Valdez of second degree murder for shooting a passenger in a vehicle passing through an area the trio's gang claimed as its "turf." (Pen. Code, § 187, subd. (a); all further statutory references are to this code.) The jury also convicted defendants of active participation in a criminal street gang (§ 186.22, subd. (a)) and shooting at an occupied motor vehicle (§ 246), and found various penalty enhancement allegations true, including that each defendant committed the murder to promote the activities of a criminal street gang (§ 190.2, subd. (a)(22)), vicariously discharged a firearm causing death (§ 12022.53, subds. (d), (e)(1)), and committed the offenses for the benefit of a gang (§ 186.22, subd. (b)). The trial court sentenced each defendant to an aggregate term of 40 years to life.

Defendants challenge the sufficiency of the evidence to support their conviction as aiders and abettors of the actual shooter, who eluded arrest. They also contend the trial court erred in rejecting their request for a jury instruction on voluntary manslaughter based on imperfect self-defense, and Soto insists a perfect self-defense instruction was required. Defendants raise numerous unmeritorious contentions, with one minor exception and one major exception. As to Luna, the abstract of judgment must be corrected to reflect the sentence imposed. As we explain, Valdez's conviction must be reversed based on ineffective assistance of counsel because his trial attorney's failure to investigate the case and uncover a key exculpatory witness destroys our confidence in a jury verdict concluding he aided and abetted the shooter in killing the victim.

2

# I

## FACTUAL AND PROCEDURAL BACKGROUND

Harvey Romero, the victim, accompanied several friends to a party before it was broken up by police. Harvey left the party with his cousin, Anthony Romero, and three others.[1] Isidro Martinez drove, with Vanessa Bruno sitting next to him in the front seat, and Harvey sat in the back seat by a window. Anthony and his girlfriend, Kaylin Allbee, also sat in the back seat. The group set out in search of another partygoer who already had left, Chloe Cruz, and wound up on Santa Catalina Street in Stanton, an area the Crow Village criminal street gang claimed as its territory.

Unfamiliar with the neighborhood, the group remained in touch with Cruz by cell phone. As they looked for her, Martinez drove slowly in his gray SUV past several men standing in the street, including the three defendants, Jorge Huante, and two others. Defendants and Huante belonged to the Crow Village gang.

Earlier in the evening, a neighbor had heard Huante announce to defendants and another male that he had his ".38" with him. The neighbor, fearing violence, declined to give Huante a ride to a party that night and ultimately decided not to go to the party. But now Huante and the others had returned and gathered in the street.

Meanwhile, as Harvey and his friends drove by looking for Cruz, the Crow Village group approached their vehicle, with Huante and Soto leading the way, trailed by Luna and another man. One of the four called out to Martinez's vehicle, "Where are the girls at?" Anthony tried to deflect the question, saying there were none, and Martinez continued driving, but the four men kept alongside on foot.

Huante and Soto each called out at the vehicle, "Where are you from," or "Where do you bang," which Anthony understood meant "What gang are you with?" Anthony, who did not belong to a gang, felt the encounter was escalating and declined to

---

[1] For ease of reference, we use Harvey's and Anthony's first names to differentiate between the two cousins.

respond, though he and Huante "mad dogg[ed]" each other, which he explained meant, "Like when I'm looking at somebody in a mean way." Luna and the other man trailing Huante and Soto began making gang hand signs at the SUV and calling out their gang's name.

According to one witness, Valdez stood nearby and stepped out into the street in the direction the SUV was traveling, as if to stop it.

Someone in the Crow Village group yelled at the SUV, "You know where you're at," and Huante declared, "It's Crow Village." According to a witness from the neighborhood, someone from the SUV retorted, "Fuck this neighborhood."

As Martinez began to turn at the nearest intersection, Harvey leaned his head out the window and gunfire immediately rang out. He and Allbee collapsed in the back seat. Allbee confirmed she was okay, but when Anthony tried to lift Harvey, he was limp and heavy. Anthony's hands grew very warm and he realized Harvey was bleeding profusely from his face. At some point in the confrontation and commotion, Anthony saw Huante holding a gun. Another witness in the neighborhood also saw Huante pull out and fire the gun.

Martinez sped away to find a hospital, but spotted Orange County Sheriff Department deputies conducting an unrelated traffic stop, so Martinez pulled over for help. Back at the shooting scene, Huante, Soto, and Valdez (but not Luna) had jumped into Yosep Palacio's black SUV. Valdez's girlfriend, Brianna Casanovo, already was in the car, and so was Cruz, whom Martinez's group had been trying to find.

Palacio drove off and happened to pass where Martinez had stopped to ask the sheriff's deputies for help. Martinez noticed the black SUV approaching and told one of the deputies, Peter Mach, that it looked like a vehicle he saw at the shooting scene. As the vehicle passed, Mach thought he recognized Huante from prior police contacts.

A nearby deputy gave chase, but Palacio did not stop immediately. He ultimately pulled into the back of a church parking lot, where Huante and Valdez exited

4

the vehicle and scaled a wall.  Valdez hid in a ditch, then ran back to his residence, showered, changed his clothes, and called a Crow Village neighbor to visit around 11:00 p.m.  He told the neighbor of his escape after being pulled over, but as he drew a diagram of the area where the stop occurred and showed it to his neighbor, the police arrived and apprehended him.

Harvey was transported to the hospital, but died of his injuries, which included a fractured skull from the gun shot, blood loss, and brain hemorrhaging.

Police surveillance of a Westminster home led officers to Huante the next evening, but he escaped in a Mustang driven by a female accomplice, who briefly eluded police twice.  When the officers pulled the vehicle over, Huante was gone and remained at large at the time of trial.  A phone recovered from the Mustang bore traces of Huante's DNA.

A car wash employee found a gun in the bushes near the church where Palacio had been stopped.   The gun, a five-shot revolver, contained four live rounds and one fired cartridge casing.  Although the ammunition in the gun was not designed for it, the gun still could fire those rounds.  The gun ordinarily required special .38-caliber ammunition, but contained other .38-caliber bullets made by Smith and Wesson, which matched a fragment recovered from Harvey's wound.

Forensic analysis of the recovered gun showed DNA traces of at least three individuals on the grip and hammer, and at least four individuals on the trigger.  The DNA samples were not suitable to make a positive identification, but Huante, Palacios, and defendants Valdez and Luna were possible contributors to the DNA mixture on the gun grip.  Huante and defendants Valdez and Luna were also possible DNA contributors on the trigger.  The testing excluded defendant Soto as a contributor on the grip or trigger.

5

Within a week of the shooting, new graffiti at the intersection where Harvey was killed made reference to Crow Village and to Soto's and Huante's gang monikers.

Valdez's former girlfriend, Brianna Casanova, testified Valdez stood by a wall talking to a group of women at the time of the shooting. After she heard gun fire, Valdez joined her in Palacio's car and they drove away to go to a party.

Luna's cousins and friends testified that he was at a birthday party at the time of the shooting. Soto's father and mother claimed for the first time at trial that he was home at the time of the shooting.

Bruno testified for the defense that Allbee, Anthony's girlfriend, directed Martinez where to go in Stanton to get drugs. As they drove slowly through the neighborhood, she saw between seven and 10 males nearby, and she heard the questions about whether there were any girls in the car and "where are you from?" According to Bruno, she heard two gun shots separated by a couple of seconds. None of the shots came from inside Martinez's vehicle.

The defense also called Allbee, and when she remembered little, refreshed her recollection with her statement to an investigator that she heard two gun shots.

II

DISCUSSION

A.    *Sufficiency of Evidence*

Defendants challenge the sufficiency of the evidence to support the jury's conclusion they each aided and abetted Huante in killing Harvey. Similarly, they contend the evidence does not support their conviction for aiding and abetting the offense of shooting at an occupied vehicle. Defendants' challenges lack merit.

An appellant challenging the sufficiency of the evidence "bears an enormous burden." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) It is the jury's

6

exclusive province to weigh the evidence, assess the credibility of the witnesses, and resolve conflicts in the testimony. (*Ibid.*) The reviewing court must view the record in the light most favorable to the judgment below. (*People v. Elliot* (2005) 37 Cal.4th 453, 466.) The test is whether substantial evidence supports the verdict (*People v. Johnson* (1980) 26 Cal.3d 557, 577; *Jackson v. Virginia* (1979) 443 U.S. 307, 318), not whether the appellate panel is persuaded the defendant is guilty beyond a reasonable doubt. (*People v. Crittenden* (1994) 9 Cal.4th 83, 139.) Accordingly, we must presume in support of the judgment the existence of facts reasonably drawn by inference from the evidence. (*Ibid.*; see *People v. Stanley* (1995) 10 Cal.4th 764, 792 [same deferential standard of review applies to circumstantial evidence].) The fact that circumstances can be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Bean* (1988) 46 Cal.3d 919, 932-933 (*Bean*).)

"Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259 (*Prettyman*); see § 31 [principals bear equal liability "whether they directly commit the act constituting the offense, or aid and abet in its commission"].) Thus, "a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).)

A defendant can be liable as an aider and abettor in two ways: "First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.]" (*McCoy*, *supra*, 25 Cal.4th at p. 1117.)

A person aids and abets an offense in the first manner when he, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose

7

of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 (*Campbell*).) Factors pertinent in finding the requisite intent may include "presence at the scene of the crime, companionship, and conduct before and after the offense, including flight." (*People v. Mitchell* (1986) 183 Cal.App.3d 325, 330.)

Alternately, an aider and abettor subjectively may intend only to commit a lesser offense, but bears liability for any crime that results as a natural and probable consequence. (*Prettyman*, *supra*, 14 Cal.4th at pp. 260-262.) Defendants thus may share guilt when a confederate commits an offense other than the target crime. (*Id.* at p. 262.) Unlike direct liability, the issue does not turn on the defendant's subjective state of mind, but instead on whether, considering all the circumstances, a reasonable person in the defendant's position would know or should have known the charged offense was a reasonably foreseeable consequence of acts aided and abetted. (*People v. Vasco* (2005) 131 Cal.App.4th 137, 161.) The question is for the jury to resolve in light of all the circumstances. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531.)

Assault is a general intent crime, and requires only "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) More specifically, "the criminal intent which is required for assault with a deadly weapon . . . is the general intent to willfully commit an act" likely to cause "injury to another." (*People v. Rocha* (1971) 3 Cal.3d 893, 899.) The evidence amply supported defendants' conviction as aiders and abettors of Huante's firearm assault. Because Huante fired at a passenger and pulled the trigger at such close range, the evidence also supported defendants' convictions for shooting at an occupied vehicle and murder as the natural and probable consequences of their conduct.

Huante told each defendant earlier in the evening he had a gun; indeed, a witness noted Huante called Luna over specifically to do so. The witness refused to give

8

Huante a ride to a party because Huante had the gun, and ultimately refused to attend the party knowing Huante would be there. Accordingly, the jury reasonably could infer either from Huante's personality or from his known gang ties that there was some likelihood he would use the gun. The jury also could infer defendants knew Huante might use the weapon if an opportunity arose. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1015 [jury entitled to draw logical inferences from the evidence, and appellate court must draw all inferences in favor of judgment].)

In any event, there was much more: defendants actively participated with Huante in "hitting up" Martinez's SUV later that night, knowing Huante had the gun. As a gang expert explained to the jury, gang members typically know and understand that the aggressive verbal challenge or confrontation they issue in a "hit up" often escalates to violence, including assault "at the very least." This is because gangs and gang members equate fear with respect; accordingly, intimidation tactics and violence are used to demonstrate the gang should be feared and therefore respected. Similarly, in gang culture "[d]isrespect requires immediate retaliation." The expert testified, "If you're disrespected, you have to do something right then and there or you're going to incur more disrespect."

The expert also explained gang members are expected to provide each other "backup," which includes instilling fear in potential witnesses, looking out for law enforcement, and otherwise assisting their compatriots. In other words, "When something is happening, other members that are around have to back them up, they have to be there." According to the expert, the gang conception of respect and the necessity of providing backup can form a lethal combination in the volatile context of a hit up: "if a gang member doing a hit-up is disrespected," then "backup" members also lose respect if no one "do[es] something about it."

Based on the active roles defendants played in hitting up the occupants of Martinez's SUV, the jury reasonably could conclude they shared Huante's assaultive

9

intent when he fired his gun after someone in the SUV yelled, "Fuck this neighborhood." A defendant aids and abets the commission of a crime by a fellow gang member by providing backup. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 608 [jury could infer defendants who were "part of the group" were there "to assist or 'back up' their fellow gang members" in deadly assault]; *People v. Miranda* (2011) 192 Cal.App.4th 398, 409 [defendant added to a show of force in standing behind gang compatriots during hit up]; see generally *Campbell*, *supra*, 25 Cal.App.4th at p. 409 ["concerted action reasonably implies a common purpose"].)

And given the close range at which Huante shot Harvey in the head as he leaned out of the vehicle, the jury could conclude the assault also qualified under the natural and probable consequences doctrine as both a shooting at an occupied vehicle and second degree murder. (§ 246 ["Any person who shall maliciously and willfully discharge a firearm at an . . . occupied motor vehicle . . . is guilty of a felony"]; *People v. Taylor* (2010) 48 Cal.4th 574, 623-624 [requisite malice for murder implied in intentionally committing a dangerous act with conscious disregard for life].) Murder is often a natural and probable consequence in gang confrontations, and the result is no different here. (See *People v. Medina* (2009) 46 Cal.4th 913, 922-923 [jury reasonably found "a person in defendants' position (i.e., a gang member) would have or should have known that retaliation was likely to occur and escalation of the confrontation to a deadly level was reasonably foreseeable"]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1054-1057 [attempted murder as natural and probable consequence of simple assault and breach of peace in gang context]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 732-735 [murder as natural and probable consequence of brandishing].)

Defendants attempt to minimize their participation. Luna, for example, cites testimony in which alibi witnesses claimed he was not present at the shooting. But we are in no position to second-guess the jury's conclusions as the exclusive trier of fact. (E.g., *Bean*, *supra*, 46 Cal.3d at p. 933.) The evidence showed defendants were all active

10

members in the Crow Village gang and participated in hitting up the occupants of the SUV. Soto walked alongside Huante in a lead role beside the SUV as they took turns issuing the "where you from" hit-up challenge. Each repeatedly yelled out "Crow Village," and so did Luna from a supporting position immediately behind them. None relented from what Anthony described as an escalating confrontation.

Instead, Soto renewed his verbal challenges and Luna began flashing the gang's hand signs. According to the testimony of one witness, Valdez bolstered his compatriots' show of force by stepping into the street in the SUV's path. The evidence also showed defendants knew Huante was armed. Thus, when each engaged in overt acts of intimidation in response to the SUV's implicit defiance and the explicit verbal insult uttered by one of the occupants, the jury reasonably could conclude defendants shared Huante's assaultive intent when he opened fire. Consequently, the jury could conclude on the evidence presented that defendants were each guilty as aiders and abettors for Harvey's shooting death.

B.    Ineffective Assistance of Counsel

1. Valdez

In a new trial motion below and now on appeal, Valdez argues his trial attorney, Gary Schreiber, rendered ineffective assistance of counsel (IAC), violating his right to a fair trial and undermining the sufficiency of the evidence to support his conviction. The trial court agreed counsel was deficient in failing to interview a single witness despite the murder charges against Valdez. The court also agreed counsel's failure to investigate Valdez's defense could not be considered a tactical decision. In particular, among the witnesses counsel could have contacted, Valdez contends counsel erred by making no effort to interview Martinez, the driver of the SUV.

Valdez's new attorney later did so through an investigator and learned Martinez denied anyone stepped in front of his SUV. This contradicted the lone

11

eyewitness who suggested Valdez participated in any manner in the offense. Martinez also clarified that the shooting occurred *afte*r he had turned the corner, which according to Valdez would have made it impossible for the witness to see in front of the SUV where he claimed Valdez stood. Notably, the witness (Giovanni Valdez, no relation) had admitted he did not like Valdez. Martinez also explained he saw some people on the sidewalk by a vehicle parked on the street after he made the turn, which corroborated the testimony of Valdez's ex-girlfriend that Valdez was in that vicinity, speaking to some girls at the time of the shooting. As we explain, counsel's deficient performance prevents us from placing any confidence in the verdict against Valdez.

The standard of review for an IAC claim is well settled. To prevail, a defendant must show that counsel's performance fell below prevailing professional standards and was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694 (*Strickland*).) To prove prejudice, the defendant must demonstrate a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) "'''A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations.]'" (*People v. Weaver* (2001) 26 Cal.4th 876, 925.)

The trial court correctly determined counsel inadequately investigated the case. Counsel did not hire an investigator, but merely had a bondswoman ask around the neighborhood about the shooting. She and the attorney only made contact with three individuals, none of whom witnessed or knew anything about the incident. That was the sum total of counsel's independent witness preparation defending against murder charges. Counsel claimed at the new trial hearing that he had handled "one or two" murder trials, but could not remember if he hired investigators in those cases either.

Counsel did not interview any of the witnesses identified in the police reports because he believed he knew everything they would say, based on their interviews summarized in the reports. Counsel's indolent assumption was wrong, as Martinez

12

demonstrates in two important respects. First, Martinez was listed first on the prosecutor's witness list, but when she decided not to call him, counsel made no effort to determine why the prosecutor changed her mind or what Martinez would have said. Counsel could not know without interviewing Martinez what his testimony would have been. Second, it is clear counsel did not review Martinez's police statements closely because, contrary to Giovanni's testimony, Martinez never suggested anyone stepped in front of his SUV at any time during the confrontation. If counsel had interviewed Martinez, he could have elicited — as replacement counsel did — Martinez's affidavit that he saw no one step into his vehicle's path.

Not only did counsel fail to interview witnesses, he may have tainted by illegal conduct the witnesses he could have interviewed. In a highly unorthodox decision, he had Valdez's father pick up the case discovery materials from the district attorney's office. Section 1054.2 proscribes, in pertinent part: "[N]o attorney may disclose or permit to be disclosed to a defendant, members of the defendant's family, or anyone else, the address or telephone number of a victim or witness . . . ." Willful violation of this provision is a misdemeanor. (*Ibid.*) Counsel claimed at the new trial hearing that the reports provided to father had all witness information redacted, but counsel could not have known or confirmed that until he received the reports from the defendant's father. Moreover, the redaction would have prevented counsel from contacting the witnesses, but he did not even attempt to do so. "[A] defense attorney who fails to investigate potentially exculpatory evidence, including evidence that might be used to impeach prosecution witnesses, renders deficient representation." (*In re Edward S.* (2009) 173 Cal.App.4th 387, 407; accord, *People v. Thimmes* (2006) 138 Cal.App.4th 1207, 1212 ["standard of reasonable competence requires defense counsel to diligently investigate the case"].)

The trial court concluded that while counsel's performance was deficient, a new trial was not required because the court found Martinez to be a "poor witness." The

13

court's only explanation was an opaque reference to Martinez's "demeanor" at the new trial hearing, but the court's bare assessment is not controlling. IAC claims, as mixed questions of fact and law, are "'generally subject to independent review as predominantly questions of law . . . .'" (*In re Resendiz* (2001) 25 Cal.4th 230, 248-249.) As noted, the overarching legal standard is a reasonable probability of a different outcome absent counsel's errors. (*Strickland*, *supra*, 466 U.S. at p. 687.) Here, we lack confidence in the verdict against Valdez because absent counsel's failure to investigate the case, a reasonable jury could harbor doubt about Giovanni's testimony placing Valdez in the street.

In particular, Martinez's clear insistence he turned the corner before the shot was fired made it physically impossible for Giovanni to see Valdez or anyone in front of the SUV. Anthony gave a similar account from inside the vehicle that a shot rang out *after* the turn. Valdez's counsel explained at the new trial hearing that he simply believed Anthony was mistaken about when Harvey was shot, and the jury probably reached the same conclusion. But Martinez's corroborating view as the driver would make it more likely the jury would adopt Anthony's account, and therefore more likely the jury would doubt Giovanni's testimony about where Valdez stood.

The Attorney General suggests Martinez's testimony would not have made a difference because Allbee and Bruno testified they did not see anyone in front of the SUV from their vantage point inside the vehicle. But the prosecutor effectively minimized their statements based on their position as passengers, while Martinez was the driver responsible for looking ahead. True, he acknowledged on the prosecutor's cross-examination at the new trial motion that it was "possible" he simply overlooked or failed to see Valdez in the street. But such mere speculation would be excluded at trial based on competent counsel's objection. (See *People v. Chatman* (2006) 38 Cal.4th 344, 382 ["No witness may give testimony based on conjecture or speculation"].)

14

In any event, under the IAC standard, the defendant's burden is not to establish his or her innocence, but simply a reasonable probability the error affected the outcome. For example, Martinez admitted he was distracted by the commotion occurring beside and behind his vehicle, but the jury could infer it was likely he looked ahead to make the turn. Additionally, Martinez affirmed he *did* look ahead after the turn when he spotted a vehicle with people standing by it on the sidewalk. And according to Valdez's ex-girlfriend, he was in that vicinity. Because Martinez did not see Valdez in the street either in making the turn or after, a reasonable jury could doubt Giovanni's contrary claim.

The Attorney General asserts that even if Valdez did not step out into the street, his conviction may be affirmed simply on the gang expert's testimony that gang members are expected to "back up" their fellow gang members. But that is precisely the point: if Valdez did not step into the street, there is little in the record to suggest he actually backed up Huante in any meaningful way. Because Valdez's trial counsel failed to diligently investigate the case and present Martinez's exculpatory testimony, we cannot say with confidence the jury would have concluded Valdez aided and abetted Huante in killing Harvey. His conviction therefore must be reversed.

2. Soto and Luna

Soto and Luna also assert ineffective assistance of counsel in conjunction with challenging the sufficiency of the evidence to support their convictions. Citing *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), Luna argues he received defective representation because trial counsel failed to object to the gang expert's testimony about how gang members typically back each other up and react violently to perceived disrespect. An objection would have been futile, however, because the expert's testimony was proper.

15

The expert did not, as precluded in *Killebrew*, opine about defendants' specific intent or knowledge. (*Killebrew*, *supra*, 103 Cal.App.4th at pp. 650, 658; but see *People v. Vang* (2011) 52 Cal.4th 1038, 1048, fn. 4 (*Vang*) [observing that "in some circumstances, expert testimony regarding the specific defendants might be proper"].) Instead, the expert was responding to the prosecutor's hypothetical, and explained what most gang members or "most people, based on your facts," would expect or believe. As the Supreme Court explained in *Vang*, an expert may give an opinion based on hypothetical facts mirroring the case precisely because an expert's testimony must "'be rooted in facts shown by the evidence.' [Citations.]" (*Vang*, at p. 1045.) The expert here did not stray outside the bounds of the prosecutor's hypothetical, and Luna's challenge therefore fails. (See also *People v. Gonzalez* (2006) 38 Cal.4th 932, 946, fn. 3 [expert may properly testify concerning typical gang member motivations and intent, though this touches on ultimate issues of motive and intent].)

C. Jury Instructions

1. Self-Defense: Imperfect and Perfect

Defendants contend the trial court erred in refusing their request for a voluntary manslaughter jury instruction based on imperfect self-defense. Soto contends the same evidence required an instruction on justified homicide, or perfect self-defense, which the trial court also refused. The trial court did not err.

A trial court must instruct on a lesser-included offense "'*only if there is substantial evidence to support*'" it. (*In re Christian S.* (1994) 7 Cal.4th 768, 783, original italics.) "Where the theory is the defendant committed a lesser included offense the court must instruct on the lesser included offense when there is evidence from which a jury composed of reasonable persons *could* conclude the defendant was guilty of the lesser crime. [Citations.]" (*People v. Glenn* (1991) 229 Cal.App.3d 1461, 1465, overruled on another ground by *People v. Blakeley* (2000) 23 Cal.4th 82, 91.) We review

16

a trial court's refusal to instruct on a lesser-included offense de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*).)

"'"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." [Citation.]'" (*Manriquez*, *supra*, 37 Cal.4th at p. 581.) Hence, while so-called "perfect" self-defense requires an actual *and* reasonable belief in imminent danger of death or great bodily injury, imperfect self-defense requires only an actual but unreasonable belief in the same imminent danger. (*Ibid*.)

The trial court *did* instruct the jury on voluntary manslaughter as a lesser included offense of murder based on heat of passion or provocation. The court gave the instruction over the prosecutor's objection based on the theory an alleged statement by one of the victims ("Fuck your neighborhood") may have so enraged Huante as to have obscured his reason. (But see *People v. Avila* (2009) 46 Cal.4th 680, 706 (*Avila*) [hearing a person shout possible gang references or a challenge would not cause an ordinarily reasonable person to become homicidally enraged]; *Manriquez*, *supra*, 37 Cal.4th at p. 584 ["'no defendant may set up his own standard of conduct and justifiy or excuse himself because in fact his passions were aroused, unless . . . the facts and circumstances were sufficient to arouse the passions of the ordinary reasonable man'"].)

Defendants assert they were entitled to an imperfect self-defense instruction based on evidence of a slow-moving car in a gang neighborhood. As Valdez phrases it, "there was support for the inference of an honest good faith belief that there was about to be a drive-by shooting." Soto bases his insistence on a perfect self-defense instruction on the same evidence.

We note an essential predicate of defendants' imperfect self-defense claim is missing: none of the defendants testified, and there was no evidence to suggest any of

them unreasonably misperceived a need for self-defense. Defendants' claims fail because unreasonable self-defense is based on an honest but unreasonable *misperception* that the circumstances that would furnish a claim for objectively reasonable self-defense actually exist. And justified self-defense, in turn, is based on the existence of such objectively reasonable circumstances, accurately perceived. As explained in *Avila* and *Manriquez*, no defendant may set up his or her own standard of reasonable conduct. And no objectively reasonable person would conclude a slow-moving vehicle presents a deadly threat warranting deadly counterforce. Gang members may not set up their distorted reality as governing law, and therefore defendants' claims are without merit.

Defendants attempt to bolster their claim by arguing that some witnesses heard more than one gunshot, but there was *no* evidence anyone in the victim's vehicle was armed, let alone fired a gun. There is no duty to "give instructions based solely on conjecture and speculation." (*People v. Young* (2005) 34 Cal.4th 1149, 1200.) The trial court correctly concluded self-defense instructions were not required.

2. Flight

Luna contends the trial court erred in providing a standard flight instruction without specifying it did not apply to him because, unlike for Soto and Valdez, there was no evidence he fled. The trial court instructed the jury: "The flight of a person immediately after the commission of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all the other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

Luna did not challenge the instruction below or seek its modification. His claim fails on appeal for several reasons. First, the trial court's instructions expressly told the jury some instructions might not apply, depending on the jury's determination of the facts. (CALCRIM No. 200.) Second, the flight instruction itself reiterated this for the

18

jury, specifying it only applied "if proved," and the prosecution made no suggestion or attempt to prove Luna fled. Finally, if Luna believed the instruction should be modified or more specifically tailored, it was his duty to request a pinpoint instruction, and his failure to do so forfeits the issue. (Evid. Code, § 355; *People v.Anderson* (2011) 51 Cal.4th 989, 998; *People v. Hart* (1999) 20 Cal.4th 546, 622.)

D.              Equal Protection

Luna contends the Legislature's sentencing scheme for juvenile offenders violates equal protection because his term of 25 years to life renders him eligible for parole at a later date than if he were sentenced to a life term without the possibility of parole (LWOP). Defendant is mistaken.

His alleged equal protection violation involves the interplay between two statutes: section 1170, subdivision (d)(2), and section 3051. In September 2012, California enacted Senate Bill No. 9, which amended section 1170 by adding subdivision (d)(2). (Stats. 2012, ch. 828, § 1.) That statute provides that juveniles "sentenced to imprisonment for life without the possibility of parole" may submit to the sentencing court "a petition *for recall and resentencing*" after serving "at least 15 years of that sentence." (§ 1170, subd. ( d)(2)(A)(i), italics added.)

The following year, the Legislature enacted Senate Bill No. 260, amending section 3051 and other provisions. (Stats. 2013, ch. 12, § l.) Under section 3051, subdivision (b)(3), "[a] person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions."

The flaw in Luna's argument is that he assumes LWOP offenders "have the potential to be *released from custody* after serving 15 years, while [those in his position] cannot be paroled until serving at least 24 years of their sentence." But section 1170, subdivision ( d)(2), does not allow for *release* after 15 years; under that subdivision, LWOP offenders can merely "submit to the sentencing court a petition for recall and resentencing" after 15 years. *If* the court makes certain findings, it can then "hold a hearing to consider whether *to recall the sentence* and commitment previously ordered and *to resentence the defendant in the same manner as if the defendant had not previously been sentenced . . . .*" (§ 1170, subd. (d)(2)(E), italics added.) In other words, the statute does not entitle an LWOP defendant to earlier release than a defendant in Luna's position, but instead simply to the opportunity to be sentenced, like Luna, to a term that includes parole eligibility. There is no disparate treatment as Luna claims.

E.          Abstract of Judgment

As the Attorney General concedes, the abstract of judgment must be corrected to reflect that the trial court specified Luna need not serve his full 40-year sentence before becoming eligible for parole. At sentencing, the court noted it had "discretion to say that he doesn't have to wait until he completes his 40 years before he's up for parole. He can be paroled as early as 25 years. And I'm going to put that as part of my order." But the court's minute order and the abstract of judgment omit the court's parole-eligibility order. We direct the trial court to amend the abstract of judgment to ensure Luna receives parole consideration no later than it specified. (§ 1260.)

III

DISPOSITION

Defendant Valdez's conviction is reversed on all counts, specifically, second degree murder, active participation in criminal street gang, shooting at an occupied vehicle, and the accompanying enhancements. The trial court is directed to

20

correct the abstract of judgment to reflect that Luna is entitled to a parole hearing after serving 25 years of his sentence, and to forward the corrected abstract to the Department of Corrections and Rehabilitation.  The judgment is affirmed in all other respects.


                                        ARONSON, ACTING P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.


21